159 F.3d 749
 Dennis CHARETTE Plaintiff-Appellant,
v.
TOWN OF OYSTER BAY, Louis J. Yevoli, individually, and as
Town Supervisor; Alan Landman, individually, and as
Building Superintendent, Department of Planning and
Development; Patricia L. McGuire, individually, and as
Commissioner of Department of Planning and Development; and
Anthony Costanza, individually and as Zoning Inspector of
the Department of Planning and Development, Defendants-Appellees.
 Docket No. 98-7140.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 15, 1998.
Decided Oct. 29, 1998.
 
 Herald Price Fahringer, New York, New York (Ralph J. Schwarz, Jr., Richard S. Brown, Jr., New York, New York, on the brief), for Plaintiff-Appellant.
 Perry S. Reich, Lindenhurst, New York, (Steven M. Schapiro, Schapiro & Reich, Lindenhurst, New York, on the brief), for Defendants-Appellees.
 Before: FEINBERG and KEARSE, Circuit Judges, and CASEY, District Judge.*
 KEARSE, Circuit Judge:
 
 
 1
 Plaintiff Dennis Charette appeals from an order of the United States District Court for the Eastern District of New York, Leonard D. Wexler, Judge, denying his motion for a preliminary injunction prohibiting defendants Town of Oyster Bay ("Oyster Bay" or the "Town") et al. from enforcing a Town zoning requirement that he obtain a permit for the operation of a topless bar, allegedly in violation of his rights under the First Amendment and the Equal Protection Clause of the Fourteenth Amendment. The district court denied the motion on the ground that Charette had failed to show a likelihood of success on the merits and the imminence of irreparable injury if a preliminary injunction were not granted. On appeal, Charette contends (a) that he is likely to succeed on the merits because the Town ordinance lacks sufficiently objective standards for the issuance of permits and is unconstitutional on its face and as applied to him, and (b) that he showed irreparable injury by indicating his readiness to reopen the bar upon receipt of a certificate of occupancy, which the Town has withdrawn because he has no zoning permit, and that in any event irreparable injury should be presumed from a violation of First Amendment rights. For the reasons that follow, we remand for further proceedings.
 
 I. BACKGROUND
 
 2
 Certain core facts are undisputed. For some 22 years, the "Raven's Nest" was operated in Oyster Bay as a bar with live nude or topless dancing. Charette at first owned the business and rented the premises; he later purchased the premises, sold the business to M.F.B. Lounge Corp. ("MFB"), and leased the premises to MFB. In 1997, criminal proceedings were commenced against MFB and Charette in state court for violation of the Town zoning ordinance; the Town revoked the certificate of occupancy for the building in which the "Raven's Nest" was operated, and the Raven's Nest was closed. The present suit was brought to require the Town to allow Charette to reopen the Raven's Nest.
 
 A. The Oyster Bay Zoning Ordinance
 
 3
 The Town's zoning ordinance, see Town of Oyster Bay, N.Y.Code ch. 246 (1989) ("Code"), to the extent pertinent here, creates three categories of business districts: "Neighborhood" business districts, which it calls "F Business Districts" (hereafter "F Zones"), see Code art. XX, § 246-239; "General" business districts, which it calls "G Business Districts" (hereafter "G Zones"); see id. art. XXI, § 246-250; and "Central" business districts, which it calls "G1 Business Districts" (hereafter "G1 Zones"), see id. art. XXII § 246-261. The Town also has light-industry districts, which it calls "H Industrial Districts," or "H" zones. See id. art. XXIII §§ 246-271, 246-272. The Code limits by zone the operation of certain types of establishments such as restaurants, bars, taverns, and cabarets, all of which are defined terms.
 
 
 4
 The Code defines a restaurant as follows: "A public eating place which is primarily and regularly used for serving of meals and which has suitable kitchen facilities connected therewith. Dancing is permitted only as an accessory and incidental use." Id. § 246-1. Bars and taverns are defined as "building[s] or any part thereof in which there is primarily served or offered for sale beer, wine and/or liquor for in-house consumption." Id. "Cabaret" is defined as "[a]ny premises where, in conjunction with the sale or service of food and/or drink to the public, patrons are entertained by performers. The concept of dinner-theater is included within this definition." Id. The term "theater" is not defined.
 
 
 5
 With respect to F Zones, the Code provides that no building or premises may be used except for uses listed in Code § 246-239(A). The uses allowed in F Zones include restaurants with a permitted occupancy of not more than 75 persons, id. § 246-239(A)(14)(a); "bars or taverns, when permitted by the Town Board, as a special exception, after a public hearing," id. § 246-239(A)(14)(b); and "theaters, when permitted by the Town Board, as a special exception, after a public hearing," id. § 246-239(A)(15). Cabarets are not expressly mentioned, but the Code also allows in F Zones
 
 
 6
 [o]ther uses which, in the opinion of the Town Board, after a public hearing, meet the standards set forth in § 246-18 and are of the same general character as those listed as permitted uses in this district.
 
 
 7
 Code § 246-239(A)(23).
 
 
 8
 Cabarets are listed among the uses allowed in G and G1 Zones. They are allowed in G Zones "only when permitted by the Town Board, as a special exception, after a public hearing." Code § 246-249(A)(18)(b). Similarly, in G1 Zones, the Code allows
 
 
 9
 cabarets and nightclubs, but only on the highest floor of the building in which they are located, and only when approved as a special exception by the Town Board, after a public hearing.
 
 
 10
 Id. § 246-261(B)(5)(d). Further, any use that is allowed in a business district is, upon approval by the Town Board, allowed in an "H" zone. See Code § 246-272(A)(6).
 
 
 11
 As indicated in § 246-239(A)(23), the standards governing the issuance of permits for "[o]ther uses ... of the same general character as those listed as permitted uses in" F Zones are set forth in Code § 246-18. The latter section requires the Town Board (or "Board"), which is the Town's governing body, to appoint a Board of Appeals to investigate and report on matters referred to it by the Town Board. Section 246-18 requires that, before a permit may be issued, the Board of Appeals must determine that the proposed use will not disturb the orderly and reasonable use of other property in the district and adjacent districts, that "the safety, the health, the welfare, the comfort, the convenience or the order" of the Town will not be adversely affected by the proposed use, and that the use is consistent with the general purposes and intent of the Town's zoning laws. Code § 246-18(B)(1). The Board of Appeals is also to consider the effects of the proposed use on property values, traffic, parking, recreational facilities, and sanitation; whether the use will tend to create overcrowding, gases, odors, dust, noise, or light; and whether the use will aggravate the risk of a fire, flood, or panic. See id. § 246-18(B)(2). In "authorizing such permissive uses," the Board of Appeals is to "impose such conditions and safeguards as it may deem appropriate, necessary or desirable to preserve and protect the spirit and objectives of" the Code. Id. § 246-18(C). The Board of Appeals also has the power to allow variances from the Code's requirements "so that the spirit of the chapter shall be observed, public safety and welfare secured and substantial justice done." Id. § 246-18(A).
 
 
 12
 B. The Raven's Nest and the Prior Criminal Proceedings
 
 
 13
 The Raven's Nest is located in an F Zone. Opened by Charette in February 1975, it served soft drinks and provided live entertainment in the form of topless dancers. In April 1975, Charette obtained a liquor license and thereafter served alcoholic beverages. In 1982 or 1983, state criminal proceedings were brought against Charette and his wholly-owned corporation, which then owned the Raven's Nest, for operating a "bar/cabaret" in an F Zone without a license. Although the charges against Charette individually were eventually withdrawn, his corporation was convicted, and the court imposed several fines. The court did not, however, enjoin the Raven's Nest's continued operation. In 1986, Charette sold the business to MFB.
 
 
 14
 In 1997, state criminal proceedings were commenced against Charette and MFB, charging that the business was operating as a cabaret, and that "[a] cabaret is not a permitted use in an 'F' Neighborhood Business District without first applying to the Town Board after a public hearing." (Information dated February 3, 1997 ("1997 Information").) Soon thereafter, the Town revoked the certificate of occupancy for the Raven's Nest premises, and an injunction was issued against the bar's continued operation during the pendency of the criminal proceedings.
 
 
 15
 Following a bench trial, the state court found that the Raven's Nest had initially been operated as a cabaret-type establishment and that after Charette obtained a liquor license in April 1975, the premises "took on the additional characteristic of a tavern." Town of Oyster Bay v. MFB Lounge Corp., Nos. 11452/97, etc., Transcript (Dist. Ct. Nassau County June 11, 1997) ("State Posttrial Tr.") at 2. The court found
 
 
 16
 as a matter of law that a cabaret (a place where live entertainment is had) is of the same general character of businesses which under [§ 246-239(A)(23) ] would require a special use permit after a public hearing.
 
 
 17
 (State Posttrial Tr. at 3.) Finding that no permit had been obtained, the court found MFB guilty of violating the Town's Code. Charette individually was not convicted.
 
 
 18
 C. The Present Action and the Denial of a Preliminary Injunction
 
 
 19
 In October 1997, Charette (along with MFB, which was later dropped as a party) commenced the present action under 42 U.S.C. § 1983 (1994), alleging principally that enforcement of the Town's zoning ordinance against Charette violates his rights under the First Amendment. The complaint requests, inter alia, a judgment declaring that Code § 246-239(A)(23) is unconstitutional, awarding compensatory and punitive damages, and enjoining the Town from interfering with Charette's operation of the Raven's Nest.
 
 
 20
 Charette promptly moved for a preliminary injunction, stating that he saw no need for an evidentiary hearing because there were only issues of law. In various arguments and affidavits, Charette asserted, inter alia, that he had obtained a state court judgment of eviction against MFB; that he planned to operate the Raven's Nest himself; and that the 1997 prosecutions of Charette and MFB were part of "a scheme [by the Town] to eliminate all adult uses in the Town of Oyster Bay" (Affidavit of Charette's attorney Ralph J. Schwarz dated October 1, 1997, p 4).
 
 
 21
 Charette also argued that the Town Code is unconstitutional because of its vague standards for the issuance of permits. He argued that a cabaret is an "[o]ther use[ ] ... of the same general character as those listed as permitted uses in" F Zones and that Raven's Nest could therefore be operated in its present location if the Town Board would issue a permit pursuant to § 246-239(A)(23). However, he argued that the permit requirement is invalid because § 246-239(A)(23), by referring to § 246-18, allows the Town Board to issue or deny permits on the basis of broad standards such as health, safety, and welfare, which are vague and undefined.
 
 
 22
 In response, the Town argued that the permit requirement of § 246-239(A)(23) is irrelevant to Charette's claims because the Raven's Nest
 
 
 23
 is located in a Business "F" zone which does not permit any bars or cabarets, a circumstance which has nothing to do with any "special permits." The use is simply not a permitted use in this district in the same manner that such bars are not permitted in any residence zone. They are allowed in a "G" zone, or an "H" zone, but plaintiff's establishment is not located in either of those proper zones.
 
 
 24
 (Defendants' memorandum dated November 10, 1997, in opposition to motion for preliminary injunction ("Town Nov. 10 Memorandum") at 6 (emphasis in original).) The Town argued that its Code does not attempt to regulate speech; that it is content-neutral and does not directly or explicitly regulate adult uses; and that it simply bans cabarets from F Zones, while allowing them in G, G1, and H zones. Accordingly, the Town argued, even if Charette's request that § 246-239(A)(23) be declared unconstitutional were granted, and even if the permit requirements were eliminated from the Code, there would be no basis on which a court could rule that the Raven's Nest is entitled to operate in an F Zone.
 
 
 25
 Charette disputed the Town's position that cabarets are entirely excluded from F Zones, submitting an affidavit stating that the Town has in fact allowed several cabaret-type establishments to operate in F Zones. The Town complained that it had received Charette's affidavit only one day before the hearing, and stated that it did not concede the affidavit's accuracy. No evidentiary hearing was held on any of the parties' assertions.
 
 
 26
 The district court denied Charette's preliminary injunction motion from the bench. Expressing skepticism as to the assertion that if the requested injunction were granted Charette would reopen the Raven's Nest immediately, the court stated that Charette had failed to show imminent irreparable harm. The court also stated that Charette's likelihood of success on the merits was "very stretching of the imagination." (Transcript of Hearing on Preliminary Injunction Motion, November 18, 1997, at 16.) This appeal followed.
 
 II. DISCUSSION
 
 27
 On appeal, Charette principally pursues his contentions (a) that the Oyster Bay Code is invalid on its face because of the vague standards under which the Town Board may grant or deny permits, and (b) that the Code is invalid as applied to him because the Town is in fact permitting other cabarets in F Zones. In opposition, the Town argues that the Code forbids all live entertainment in F Zones and that "it is possible that" the cabarets that Charette contends are currently operating in F Zones "either have prior non-conforming uses or have obtained a use variance" (Defendants' brief on appeal at 21). The Town also contends that if the Code's broad standards for the issuance of permits were held to violate the First Amendment, principles of severability would simply lead to the elimination of the permit requirements. The Town argues that since Charette could not operate the Raven's Nest in an F Zone but could operate it in a G, G1, or H zone, the Code merely imposes time, place, and manner restrictions that are permissible under the First Amendment.
 
 
 28
 For the reasons that follow, we conclude that the record in the district court was not sufficiently developed to permit the appropriate resolution of Charette's motion.
 
 A. First Amendment Principles
 
 29
 Nonobscene nude dancing performed as entertainment has expressive content that is protected by the First Amendment. See Barnes v. Glen Theatre, Inc., 501 U.S. 560, 565-66, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991) (plurality opinion); id. at 581, 111 S.Ct. 2456 (Souter, J., concurring); id. at 587, 592-93, 111 S.Ct. 2456 (White, J., dissenting); LaTrieste Restaurant & Cabaret Inc. v. Village of Port Chester, 40 F.3d 587, 590-91, 592 (2d Cir.1994) (treating topless dancing as First Amendment activity for purposes of selective enforcement challenge under the Equal Protection Clause); Redner v. Dean, 29 F.3d 1495, 1499 (11th Cir.1994), cert. denied, 514 U.S. 1066, 115 S.Ct. 1697, 131 L.Ed.2d 560 (1995).
 
 
 30
 Municipal "regulations enacted for the purpose of restraining speech on the basis of its content presumptively violate the First Amendment." City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 46-47, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986).
 
 
 31
 On the other hand, so-called "content-neutral" time, place, and manner regulations are acceptable so long as they are designed to serve a substantial governmental interest and do not unreasonably limit alternative avenues of communication.
 
 
 32
 Id. at 47, 106 S.Ct. 925.
 
 
 33
 [W]ith respect to businesses that purvey sexually explicit materials, zoning ordinances designed to combat the undesirable secondary effects of such businesses are to be reviewed under the standards applicable to "content-neutral" time, place, and manner regulations.
 
 
 34
 Id. at 49, 106 S.Ct. 925 (footnote omitted) (explaining Young v. American Mini Theatres, Inc., 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976)). The appropriate inquiry in such cases is "whether the [municipal] ordinance is designed to serve a substantial governmental interest and allows for reasonable alternative avenues of communication." City of Renton v. Playtime Theatres, Inc., 475 U.S. at 50, 106 S.Ct. 925; see Marty's Adult World of Enfield, Inc. v. Town of Enfield, 20 F.3d 512, 515 (2d Cir.1994) (First Amendment did not invalidate zoning regulations that, for substantial governmental reasons, required a permit for the operation of a viewing-booth business in certain districts, but allowed operation of the business in other parts of the town without a permit).
 
 
 35
 When a municipality has adopted a regulatory scheme that requires a business to obtain a permit to operate regardless of its location, that scheme must set objective standards governing the grant or denial of license applications, in order to ensure that the officials not have the "power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers." City of Lakewood v. Plain Dealer Publishing Co., 486 U.S. 750, 759, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988). "[A] law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional." Shuttlesworth v. City of Birmingham, 394 U.S. 147, 150-51, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969); see id. at 149, 89 S.Ct. 935 (reversing convictions entered under ordinance that allowed city commissioners to grant or deny parade license based on their ideas of "public welfare, peace, safety, health, decency, good order, morals or convenience"); Staub v. City of Baxley, 355 U.S. 313, 322, 325, 78 S.Ct. 277, 2 L.Ed.2d 302 (1958) ("general welfare" standard too indefinite); 414 Theater Corp. v. Murphy, 499 F.2d 1155, 1156 n. 1, 1159 (2d Cir.1974) ("welfare and benefit of the people of and visitors to the city" standard too indefinite).
 
 B. Preliminary Injunctions
 
 36
 A party seeking a preliminary injunction generally must establish "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir.1979).
 
 
 37
 "However, in a case in which 'the moving party seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme,' the injunction should be granted only if the moving party meets the more rigorous likelihood-of-success standard." Bery v. City of New York, 97 F.3d 689, 694 (2d Cir.1996) (applying higher standard to motion to enjoin enforcement of city regulation prohibiting unlicensed public exhibits of visual art) (quoting Plaza Health Laboratories, Inc. v. Perales, 878 F.2d 577, 580 (2d Cir.1989)), cert. denied, --- U.S. ----, 117 S.Ct. 2408, 138 L.Ed.2d 174 (1997).
 
 
 38
 In the context of a motion for a preliminary injunction, "[v]iolations of First Amendment rights are commonly considered irreparable injuries." Bery v. City of New York, 97 F.3d at 693; see Elrod v. Burns, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). Nonetheless, "it often will be more appropriate to determine irreparable injury by considering what adverse factual consequences the plaintiff apprehends if an injunction is not issued...." Time Warner Cable v. Bloomberg L.P., 118 F.3d 917, 924 (2d Cir.1997).
 
 
 39
 The procedures to be used by the district court to resolve preliminary injunction issues will normally be shaped by the nature and extent of the controversy and the requirement that the "grant[ ] or refus[al]" of a preliminary injunction be accompanied by "the findings of fact and conclusions of law which constitute the grounds of [the court's] action," Fed.R.Civ.P. 52(a). An evidentiary hearing is not required when the relevant facts either are not in dispute or have been clearly demonstrated at prior stages of the case, see, e.g., Republic of the Philippines v. New York Land Co., 852 F.2d 33, 37 (2d Cir.1988), or when the disputed facts are amenable to complete resolution on a paper record, see Consolidated Gold Fields PLC v. Minorco, S.A., 871 F.2d 252, 256 (2d Cir.1989). However, the motion "should not be resolved on the basis of affidavits which evince disputed issues of fact." Forts v. Ward, 566 F.2d 849, 851 (2d Cir.1977). A party may, of course, waive its right to an evidentiary hearing, see, e.g., Consolidated Gold Fields PLC v. Minorco, S.A., 871 F.2d at 256 & n. 3; Fengler v. Numismatic, 832 F.2d 745, 748 (2d Cir.1987); Drywall Tapers & Pointers v. Operative Plasterers' & Cement Masons' International Ass'n, 537 F.2d 669, 674 (2d Cir.1976), but it is not entitled to have the court accept its untested representations as true if they are disputed.
 
 
 40
 We review the denial of a preliminary injunction under an abuse-of-discretion standard. See, e.g., Coca-Cola Co. v. Tropicana Products, Inc., 690 F.2d 312, 315 (2d Cir.1982); Gillespie & Co. v. Weyerhaeuser Co., 533 F.2d 51, 53 (2d Cir.1976) (per curiam). Either an error of law or a clear error of fact may constitute an abuse of discretion. See, e.g., Ferris v. Cuevas, 118 F.3d 122, 125 (2d Cir.1997); International Dairy Foods Ass'n v. Amestoy, 92 F.3d 67, 70 (2d Cir.1996); Chemical Bank v. Haseotes, 13 F.3d 569, 573 (2d Cir.1994) (per curiam).
 
 
 41
 C. The Record and Findings in the Present Case
 
 
 42
 In the present case there seems to be no dispute that the Raven's Nest is located in an F Zone; that it operated as a live-entertainment cabaret; that it presented nonobscene nude or topless dancing; and that First Amendment rights are therefore implicated. And while the Oyster Bay Code lists a number of specific factors that Town officials are to consider in determining whether to issue permits for cabarets, it is indisputable that the Code also requires Town officials to withhold permits on the basis of their views as to health, safety, welfare, comfort, convenience, and order--i.e., broad standards of the type that have been held insufficient to pass First Amendment muster. There are, however, several controversies relevant to Charette's preliminary injunction motion as to which the district court made no findings and which indeed do not seem susceptible to resolution on the present record.
 
 
 43
 As to the likelihood that Charette will succeed on the merits of his claims, there is dispute, for example, as to the scope of the uses permitted by the Code in F Zones. At oral argument of this appeal, the Town, in arguing that the Code is content-neutral, represented that the Code simply bans all live entertainment from F Zones. That assertion is questionable in light of the fact that the Code expressly allows some F Zone uses that could be interpreted as involving live entertainment, such as restaurants (defined to permit "dancing ... as an accessory and incidental use," § 246-1), and "theaters," § 246-239(A)(15), a term that in common parlance may refer both to buildings in which films are exhibited and to buildings in which live performances are given. The term "theaters" is not defined in the Code, and its meaning, which may be relevant to whether a permit may be granted under § 246-239(A)(23) on the basis that a cabaret is of the same general character as the theaters allowed in F Zones, is open to question.
 
 
 44
 In the district court, in opposing Charette's motion, the Town made the more limited assertion that the Code bans all cabarets from F Zones. The correctness of that representation too is open to question. Though the Town stated, for example, that "a Business 'F' zone ... does not permit any bars or cabarets, a circumstance which has nothing to do with any 'special permits' " (Town Nov. 10 Memorandum at 6 (emphasis in original)), the assertion as to bars is contradicted by the language of the Code, which lists as an allowed F Zone use "bars or taverns, when permitted by the Town Board, as a special exception, after a public hearing," id. § 246-239(A)(14)(b) (emphasis added), and the assertion as to cabarets is suspect in light of positions taken by the Town at other times. For example, the repeated prosecutions of Charette and the Raven's Nest owners charged them with operating in an F Zone without a permit. (See, e.g., 1997 Information ("A cabaret is not a permitted use in an 'F' Neighborhood Business District without first applying to the Town Board after a public hearing." (emphasis added))). The language of the criminal charges seems to imply that a permit for the operation of a cabaret in an F Zone is available under the Code. And that implication finds express support in the Town's early arguments in opposition to Charette's preliminary injunction motion, which stated that "plaintiff's 'protected' activity takes place in a zoning category, where special permits are needed for all cabaret-type restaurants--whether they feature topless dancing or not." (Affidavit of Town's attorney Steven M. Schapiro dated October 8, 1997, p 19 (emphasis added).)
 
 
 45
 The Town's assertion that the Code simply bans all cabarets from F Zones was directly disputed by Charette, who filed an affidavit stating that several cabarets are in fact in operation in F Zones. In the district court, the Town complained that the eleventh-hour timing of the affidavit gave it no opportunity to reply in writing, but it expressed orally on the record its refusal to concede the accuracy of Charette's representation. In its brief on appeal, the Town speculates that if there are establishments providing live entertainment in F Zones, it is possible that they are operating under grandfather rights or pursuant to zoning variances.
 
 
 46
 We note that the state court, in finding MFB guilty of operating in an F Zone without a permit, stated its view that permits could be issued to cabarets for operation in F Zones pursuant to § 246-239(A)(23)'s authorization for "[o]ther uses ... of the same general character" as those expressly listed as permitted in F Zones. If such permits are available, questions arise as to whether the permit requirement is content-neutral; whether the permit requirement is designed to serve a substantial governmental interest; whether furtherance of that interest is the primary purpose of the requirement, or whether instead the primary purpose is the regulation of speech; whether any facially suspect aspects of the Code--i.e., the discretion conferred on Town officials to deny permit applications on the basis of broad and unspecific standards--may be severed from the remainder of the Code; and what the effect of such a severance would be on the relief to which Charette might be entitled. The answers to these questions will have a substantial impact on any assessment of Charette's likelihood of success on the merits.
 
 
 47
 The district court made no findings as to such matters as the meaning of the Code, the purposes of its permit provisions, or the manner in which the Town has enforced these provisions against other cabarets in general and adult establishments in particular. And the record, as it has been developed thus far, does not appear to lend itself to the sound resolution of the open questions.
 
 
 48
 As to the likelihood of irreparable injury to Charette in the absence of a preliminary injunction, the record is also unclear. The district court apparently concluded that such a likelihood had not been shown because the court was not persuaded that if an injunction were granted the reopening of the Raven's Nest by Charette would be imminent. The state of the record on this issue is both sketchy and fluid. For example, when the preliminary injunction motion was made, MFB was a plaintiff in this case and occupied the Raven's Nest premises. MFB was thereafter dropped as a plaintiff, and Charette obtained a state-court judgment of eviction against MFB. It is not clear, however, whether or not MFB has vacated the premises; nor is the record clear as to whether Charette, having sold the business to MFB in 1986, has the right to operate the Raven's Nest (or a similar business under another name) on the premises. Further, in the district court proceedings, the Town suggested that Charette's reopening of the bar was not imminent because he had no liquor license. In his brief on appeal, Charette suggests that the bar could be reopened with the service of only soft drinks. We have seen in the record, however, no sworn representation by Charette that he would reopen the Raven's Nest on that basis if he could not obtain a liquor license. On the other hand, at oral argument of this appeal, Charette's counsel represented that Charette had recently received his liquor license. That, however, is not a matter of record in this case.
 
 
 49
 Finally, we have not seen in the record any firm representation as to how quickly Charette desired and was prepared to reopen the Raven's Nest in the event his motion were granted. At oral argument, we were informed that Charette had made no effort to apply for a permit for the Raven's Nest. While that fact does not, of course, deprive him of standing to assert that the Code is facially invalid, see, e.g., City of Lakewood v. Plain Dealer Publishing Co., 486 U.S. at 755-56, 108 S.Ct. 2138; Shuttlesworth v. City of Birmingham, 394 U.S. at 151, 89 S.Ct. 935, it may cast doubt on his contention that irreparable harm will result from his inability to reopen the Raven's Nest immediately. Further, the parties informed us that in the 10-month interval between the denial of the preliminary injunction motion and the argument of this appeal, Charette had done nothing to press for a speedy adjudication of the merits of his claims--another fact that may perhaps reflect negatively on his desire or preparedness to resume operations immediately.
 
 
 50
 The district court made no express findings on these questions, and they remain to be explored on remand.
 
 CONCLUSION
 
 51
 We conclude that there were several fundamental issues in dispute and that the record requires further development before the open questions may be resolved by the district court. The order denying Charette's motion for a preliminary injunction is vacated, and the matter is remanded for further proceedings not inconsistent with this opinion.
 
 
 52
 No costs.
 
 
 
 *
 Honorable Richard Conway Casey, of the United States District Court for the Southern District of New York, sitting by designation