**Dennis CHARETTE, Plaintiff,**

v.

**TOWN OF OYSTER BAY, Louis J. Yevoli, individually, and as Town Supervisor, Alan Landman, individually, and as Building Superintendent, Department of Planning and Buildings, and Patricia L. McGuire, individually, and as Commissioner of Department of Planning and Development, and Anthony Costanza, individually, and as Zoning Inspector of the Department of Planning and Development, Defendants.**

**No. CV 97–5737.**

United States District Court,
E.D. New York.

May 3, 2000.

Lipsitz, Green, Fahringer, Roll, Salisbury & Cambria, by Herald Price Fahringer and Erica T. Dubno, New York City, for plaintiff.

Schapiro & Reich, by Steven M. Schapiro, Lindenhurst, NY, for defendants.

### MEMORANDUM AND ORDER

WEXLER, District Judge.

Plaintiff Dennis Charette brought this action and sought a preliminary injunction prohibiting defendants Town of Oyster Bay (the "Town") and various Town officials from enforcing a Town zoning ordinance requiring that he obtain a special use permit for the operation of an establishment called the Raven's Nest, which provided nude/topless dancers, allegedly in violation of his First Amendments rights. After submission of papers and oral argument, this Court suggested to counsel then representing Charette that a hearing was necessary for determination of disputed issues, particularly the Town's assertion that Charette was not prepared or able to reopen the Raven's Nest (which had been closed when the Town revoked its certificate of occupancy). Charette's counsel insisted, however, that a hearing was not necessary and that the record before this Court was sufficient for a determination of the motion. This Court denied the motion primarily on the ground that Charette failed to show the imminence of irreparable injury if the preliminary injunction were not granted, and that, in any event, he failed to show a likelihood of success on the merits. Charette appealed that order. On appeal, the Second Circuit determined that there were "several fundamental issues in dispute and that the record requires further development before the open questions may be resolved." *Charette v. Town of Oyster Bay*, 159 F.3d 749 (2d Cir.1998). Accordingly, the Second Circuit vacated this Court's order denying

Charette's motion for a preliminary injunction and remanded the matter for further proceedings. *See id.*

Charette now renews his motion for a preliminary injunction. At a conference and oral argument, Charette's new counsel insisted (as did Charette's former counsel) that a hearing is not necessary for determination of the motion. This Court disagreed and directed a hearing, which was held in October 1999. For the reasons below, the motion is denied.

## I. BACKGROUND

A. *The Town of Oyster Bay Zoning Ordinance*

As the Second Circuit detailed, the Town's zoning ordinance, *see* Town of Oyster Bay, N.Y.Code ch. 246 (1989) ("Code"), in relevant part, creates three categories of business districts: "Neighborhood" business districts, known as "F Business Districts" ("F Zones"), *see* Code art. XX, § 246–239; "General" business districts, known as "G Business Districts" ("G Zones"); *see id.* art. XXI, § 246–250; and "Central" business districts, known as "G–1 Business Districts" ("G–1 Zones"), *see id.* art. XXII, § 246–261. The Town also has, among other districts, light-industry districts, known as "H Industrial Districts" ("H Zones"). *See id.* art. XXIII, §§ 246–271, 246–272.

As the Second Circuit observed, the Code limits by zone the operation of certain types of establishments, including, *inter alia,* restaurants, bars, taverns, cabarets, and theaters. Of these types of establishments, all are defined except "theaters." "Restaurant" is defined as "[a] public eating place which is primarily and regularly used for serving of meals and which has suitable kitchen facilities connected therewith. Dancing is permitted only as an accessory and incidental use." *Id.* art. II, § 246–1. "Bar" and "tavern" are defined as "building[s] or any part thereof in which there is primarily served or offered for sale beer, wine and/or liquor for in-house consumption." *Id.* "Cabaret" is defined as "[a]ny premises

where, in conjunction with the sale or service of food and/or drink to the public, patrons are entertained by performers. The concept of dinner-theater is included within this definition." *Id.*

The Raven's Nest is located in an F Zone. In F Zones, the Code provides that "no building or premises shall be used" except for the uses identified in § 246–239(A). These uses include, *inter alia,* a "[r]estaurant with a permitted occupancy of not more than seventy-five persons for the purposes of serving meals," *id.* § 246–239(A)(14)(a); "bars or taverns, when permitted by the Town Board, as a special exception, after a public hearing," *id.* § 246–239(A)(14)(b); and "theaters . . . when permitted by the Town Board, as a special exception, after a public hearing," *id.* § 246–239(A)(15). "Cabaret" is not mentioned in the list of allowed uses in F Zones. The last subsection of § 246–239(A) allows in F Zones "[o]ther uses which, in the opinion of the Town Board, after a public hearing, meet the standards set forth in § 246–18 and are of the same general character as those listed as permitted uses in this district." *Id.* § 246–239(A)(23). A central dispute between the parties is whether the Raven's Nest's operation as a "cabaret" providing nude/topless dancing is a use of the "same general character as those listed as permitted uses in [F Zones]" under § 246–239(A). While Charette claims that it is, the Town claims that it is not.

As the Second Circuit observed, "cabarets" are listed among the uses allowed in G Zones and G–1 Zones. Cabarets are allowed in G Zones "only when permitted by the Town Board, as a special exception, after a public hearing." *Id.* § 246–250(A)(18)(b). Similarly, cabarets are allowed in G–1 Zones "but only on the highest floor of the building in which they are located, and only when approved as a special exception by the Town Board, after a public hearing." *Id.* § 246–261(B)(5)(d). In H Zones, allowed uses include any use that is allowed in a business district, upon

approval by the Town Board. *See id.* § 246–272(A)(6).

As the Second Circuit further observed, § 246–239(A)(23) provides that the standards set forth in § 246–18 govern the issuance of permits for "[o]ther uses . . . of the same general character as those listed as permitted uses in [F Zones]." Section 246–18 requires the Town's governing body, the Town Board, to appoint a Board of Appeals to investigate and report on matters referred to it by the Town Board. Before the Board of Appeals may approve the issuance of a permit, the Board of Appeals must determine, *inter alia,* that "the [proposed] use will not prevent the orderly and reasonable use of adjacent properties," that "the safety, the health, the welfare, the comfort, the convenience or the order of the [T]own will not be adversely affected" by the proposed use, and that "the [proposed] use will be in harmony with and promote the general purposes and intent" of the Town's zoning laws. *Id.* § 246–18(B)(1). The Board of Appeals must also consider, *inter alia,* the effects of the proposed use on property values, traffic, parking, recreational facilities, and sanitation; whether the use will tend to create overcrowding, gases, odors, dust, noise, or light; and whether the use will aggravate the risk of a fire, flood, or panic. *See id.* § 246–18(B)(2). In "authorizing such permissive uses," the Board of Appeals is mandated to "impose such conditions and safeguards as it may deem appropriate, necessary or desirable to preserve and protect the spirit and objectives" of the Town's zoning laws. *Id.* § 246–18(C). The Board of Appeals has the power to allow variances from the Code's requirements "so that the spirit of the chapter shall be observed, public safety and welfare secured and substantial justice done." *Id.* § 246–18(A).

The provisions of § 246–18 apply "[w]henever a use . . . is permitted only if the Board of Appeals shall approve thereof." *Id.* § 246–18(B). Thus, the standards of § 246–18 also would apply to a cabaret located in a G Zone, because a cabaret is allowed in a G Zone "only when permitted by the Town Board, as a special exception, after a public hearing," *Id.* § 246–250(A)(18)(b).

## B. *The Raven's Nest and the Prior Criminal Proceedings*

Charette began operating the Raven's Nest in the Town in 1975. At the time, it served soft drinks and provided live entertainment consisting of topless dancers. In August 1975, Charette · received a certificate of occupancy. Soon thereafter, Charette obtained a liquor license and began serving alcoholic beverages at the Raven's Nest. Charette initially rented the premises in which the Raven's Nest ·was located, but he later purchased the premises.

In 1982, state criminal proceedings were brought against Charette and his wholly-owned corporation, 24–A Lounge, Inc. ("24–A Lounge"), which then owned the Raven's Nest, charging various violations of the Town's zoning ordinance. The first count of a six-count information alleged that Charette and 24–A Lounge operated a "bar/cabaret" providing "live female entertainers," and charged a violation of the Code in that such use "is not a permitted use in an [F Zone]." The second count of the information charged them with violating the Code by operating a "bar/cabaret" without first applying for, or obtaining, a proper Certificate of Occupancy, as required by law." Ultimately, the corporation pleaded guilty and was fined, and the charges against Charette individually were withdrawn. The Raven's Nest continued to operate.

In 1986, Charette sold the business to M.F.B. Lounge Corp. ("MFB"), and MFB continued operating the Raven's Nest.

In February 1997, state criminal proceedings were commenced against MFB and Charette, charging them with various violations of the Town's Code. The first count of a three-count information dated February 3, 1997, charged MFB with operating the Raven's Nest as a "cabaret" providing liquor and "female topless dancers," allegedly in violation of the Code in that

"[a] cabaret is not a permitted use in an 'F' Neighborhood Business District without first applying to the Town Board after a public hearing." Information dated February 3, 1997 ("1997 Information"). The 1997 Information also charged violations of the Code for undertaking repairs without a proper permit and for changing the use of the premises to a cabaret. *Id.*

In addition, in March 1997, the Town charged MFB with various building code, fire safety code, and electrical code violations. The Town asserts, and Charette does not dispute, that MFB pleaded guilty to these charges.

By letter dated March 21, 1997, the Town revoked the August 1975 certificate of occupancy for the premises occupied by the Raven's Nest. In the letter, Alan Landman ("Landman"), the Town's Superintendent of the Department of Planning and Development, Building Division, stated two grounds for the revocation: (1) that use as a "cocktail lounge . . . was not a permitted use in an 'F' zone on the date of the permit issuance"; and (2) that "use as a cocktail lounge in 1975 required a special use permit and a public hearing."

By order dated April 11, 1997, the state court enjoined the Raven's Nest's from occupying the premises during the pendency of the criminal proceedings.

Following a bench trial, the Town argued in a post-trial brief that "at no time was a cabaret allowed in an F Zone. In the alternative it was also made clear at the trial that in the event a cabaret use was allowed then in such event a special use permit from the Town Board was necessary . . . and no such special use permit was ever applied for or granted to the subject premises." People's Brief, at 2. By decision on June 11, 1997, the state court found MFB guilty of violating the Town's Code and imposed a fine; Charette individually was not convicted. In its decision, the state court found that the Raven's Nest had initially been operated as a cabaret-type establishment, and that after Charette obtained a liquor license in April

1975, the premises "took on the additional characteristic of a tavern." *Town of Oyster Bay v. MFB Lounge Corp.,* Nos. 11452/97, etc. (Dist.Ct.Nassau County June 11, 1997), Post–Trial Transcript, at 2. The court found "as a matter of law that a cabaret (a place where live entertainment is had) is of the same general character of businesses which under [§ 246–239(A)(23) ] would require a special use permit after a public hearing." *Id.* at 3. The court, upon finding that no permit had been, found MFB guilty of violating the Code. MFB obtained a stay of the fine pending determination of an appeal, and its request for leave to appeal to the Appellate Division, Second Department, was pending when this action was filed.

MFB has since vacated the premises, and Charette is now in possession of the property.

### C. *The Present Action and the Earlier Denial of a Preliminary Injunction*

Charette then brought this action under 42 U.S.C. § 1983, claiming principally that enforcement of the Town's zoning ordinance against him violates his rights under the First Amendment,[1] and seeking, *inter alia,* a judgment declaring Code § 246–239(A)(23) unconstitutional and enjoining the Town from enforcing its provisions, and awarding compensatory and punitive damages.

Charette moved for a preliminary injunction. He asserted, *inter alia,* that MFB had been evicted from the premises, that he planned to reopen the Raven's Nest, and that the 1997 state criminal prosecution against him and MFB was part of "a scheme [by the Town] to eliminate all adult uses in the Town of Oyster Bay." Affidavit of Ralph J. Schwarz, dated October 1, 1997, at 4. Charette argued, *inter alia,* that a "cabaret" is an "[o]ther use[ ] . . . of the same general character as those listed as permitted uses in [F Zones]," and that the Raven's Nest could therefore be operated in its present loca-

---

1. MFB had been a named plaintiff, but has since been dropped as a plaintiff.

tion if the Town Board would issue a permit pursuant to § 246–239(A)(23). However, he argued that the permit requirement is unconstitutional because § 246–239(A)(23), by referring to § 246–18, allows the Town Board to issue or deny a permit on the basis of broad standards such as health, safety, and welfare, which are vague and undefined. He maintained that there was no need for an evidentiary hearing because there were only issues of law.

The Town, on the other hand, argued, *inter alia*, that the permit requirement § 246–239(A)(23) is irrelevant to Charette's claims because the Raven's Nest

> is located in a Business "F" zone which does not permit any bars or cabarets, a circumstance which has nothing to do with any "special permits." The use is simply not a permitted use in this district in the same manner that such bars are not permitted in any residence zone. They are allowed in a "G" zone, or an "H" zone, but plaintiff's establishment is not located in either of those proper zones.

Defendants' Memorandum, dated November 10, 1997, at 6. The Town argued, therefore, that even if § 246–239(A)(23) is declared unconstitutional and the offending permit requirements are eliminated from the Code, there would be no basis for the Raven's Nest to operate in an F Zone. The Town further argued that the Code does not attempt to regulate speech, but is content-neutral, and does not directly regulate adult uses.

Charette disputed the Town's position that cabarets are entirely excluded from F Zones, asserting, in an affidavit, that the Town has allowed several cabaret-type establishments to operate in F Zones. In response to the affidavit, the Town complained that it had received the affidavit only one day before the hearing and stated that it did not concede Charette's assertions. Charette declined an evidentiary hearing, despite this Court's indication that a hearing appeared necessary given the apparently disputed factual issues.

This Court denied Charette's preliminary injunction motion from the bench. Given the state of the record, this Court questioned Charette's assertion that he would reopen the Raven's Nest immediately if the requested injunction were granted, and found that he had failed to show imminent irreparable harm. In addition, the Court questioned Charette's likelihood of success on the merits.

### D.  *The Appeal*

On appeal, Charette argued (a) that the Code is invalid on its face because of the vague standards under which the Town Board may grant or deny permits, and (b) that the Code is invalid as applied to him because the Town is in fact permitting other cabarets in F Zones. *Charette*, 159 F.3d at 750, 753. He further argued that he showed irreparable injury by indicating his readiness to reopen the Raven's Nest upon receipt of a certificate of occupancy, and that, in any event, irreparable injury should be presumed from a violation of First Amendment rights. *Id.* at 750. In response, the Town argued that the Code forbids all live entertainment in F Zones, but that " 'it is possible that' the cabarets that Charette contends are currently operating in F Zones 'either have prior nonconforming uses or have obtained a use variance.' " *Id.* at 753 (quoting Defendant's brief on appeal at 21). The Town also contended that "if the Code's broad standards for the issuance of permits were held to violate the First Amendment, principles of severability would simply lead to the elimination of the permit requirements." *Id.* The Town further argued that "since Charette could not operate the Raven's Nest in an F Zone but could operate it in a G, G1, or H zone, the Code merely imposes time, place, and manner restrictions that are permissible under the First Amendment." *Id.* The Second Circuit concluded that the record was not sufficiently developed in this Court to permit the appropriate resolution of Charette's motion for a preliminary injunction. *Id.*

E. *The Hearing*

At the hearing, Charette testified that he is in possession of the premises and that he is ready, willing, and able to resume operation of the Raven's Nest. He testified that he sought a liquor license and received a conditional approval from the New York State Liquor Authority, with an expiration of November 1998. Although he obtained a six-month extension for obtaining a liquor license because the Raven's Nest was closed at the time, the extension has since expired. Charette asserted, however, that he is prepared to open the Raven's Nest without a liquor license and that he would serve non-alcoholic beverages. He further asserted that he has not applied for a special use permit under the Town Code because those provisions are unconstitutional.

Charette testified that live entertainment has been allowed in F Zones. In this respect, Charette asserted that live entertainment was featured at three establishments located in F Zones, specifically, Wickers Restaurant, Main Maid Inn, and Locust Valley Inn. He testified that Wickers Restaurant had a disk jockey, the Main Maid Inn had a piano player, and the Locust Valley Inn had a singer and piano player. On cross-examination, he admitted that it was three years ago that he personally witnessed the piano player at the Locust Valley Inn and that he did not personally witness live entertainment at any of the other places, but learned that they provide live entertainment based on newspaper advertisements he had read and on telephone calls to unnamed persons at these establishments. He also testified that he recently remembered holding a birthday party for his daughter in or about 1996 at Antun's Catering Hall, located in an F Zone, and that Antun's provided disc jockeys. In addition, in his affidavit, he stated that Enoteca Restaurant also provided live entertainment, but he did not testify about Enoteca Restaurant at the hearing. Charette asserted that, to his knowledge, the Town has no cabaret, bar, or tavern with topless dancing, no video store that sells XXX videos, and no adult video or book store.

Charette argues that the Town conceded earlier in this litigation that a cabaret is a use permitted in an F Zone upon obtaining a special use permit. For instance, Charette notes that the Town's counsel had asserted, in opposition to Charette's initial motion for a preliminary injunction, that "the Raven's Nest as a bar/cabaret cannot operate in an F Zone without first obtaining a special exception permit." Affidavit of Steven M. Schapiro, dated October 8, 1997, ¶ 13. Charette argues that, in any event, the language of the Code permits live entertainment in F Zones. As support for this argument, he refers to § 246–239(15), which provides that uses permitted in an F Zone include "theaters, drive-in theaters and *other similar recreational uses.*" Code § 246–239(15) (emphasis added). This Court understands Charette's argument to be that "theaters" includes those theaters providing live entertainment, and, therefore, "similar recreational uses" would include similar uses providing live entertainment.

On the other hand, the Town offered evidence that live entertainment is not permitted in F Zones. In this respect, George Batista ("Batista"), the Town's Assistant Commissioner of the Department of Planning and Development, testified that if the Town becomes aware of an establishment providing live entertainment in an F Zone, the Town promptly takes steps to stop such conduct. Specifically, Batista testified that beginning in March 1999 he inspected Wickers Restaurant, Main Maid Inn, Locust Valley Inn, and Enoteca Restaurant, in response to Charette's affidavit alleging the occurrence of live entertainment at these places, to determine if live entertainment was being provided. He testified that he inspected Wickers Restaurant in March 1999 and discovered live entertainment was being provided there. As a result, he issued Wickers Restaurant a summons for alleged improper use in an F Zone. He also in-

spected the Main Maid Inn in March 1999, but did not then observe any live entertainment. He made another inspection of the Main Maid Inn in August 1999 and, although he did not observe live entertainment at the time, the manager admitted that a party room was available for rent and that the renters were permitted to bring in live entertainment. Based on the manager's admission, Batista served the Main Maid Inn a notice of violation of the Code by providing live entertainment in an F Zone. Batista testified that he planned to perform a follow-up inspection to determine if, in fact, live entertainment is being provided there. He also inspected the Locust Valley Inn in March 1999, but did not observe live entertainment. He stated that he observed a piano near the bar, but was told by the manager that the piano had been inoperable for "a number of years" and that there was never any live entertainment. However, he conducted a follow-up inspection of the Locust Valley Inn in September 1999 and observed live entertainment, specifically, a male who was singing to prerecorded music. Batista served the Locust Valley Inn a summons for violation of the Code by providing live entertainment in an F Zone. As for Enoteca Restaurant, he testified that he observed no live entertainment, although he did observe a piano. The restaurant's manager, however, told him that it had not had a piano player "in months." Batista did not know whether live entertainment was currently being provided in any of these four establishments.

Batista further testified that when his department is notified that live entertainment is occurring in an F Zone, the department investigates the allegations and conducts an inspection. In addition, Batista submitted an affidavit earlier in the action, and in opposition to Charette's renewed motion for a preliminary injunction, in which he stated that upon his review of Town records, he was able to identify five prosecutions (and convictions) in the Town over the past 12 years (all brought prior to the present dispute) against establishments for providing live entertainment in

an F Zone. On cross-examination, Batista added that each of those five establishments was charged with "a non-permitted use" in an F Zone and not with failure to have a special use permit. He acknowledged that none involved adult entertainment.

Landman testified that he is responsible for the day-to-day operations of the Town's building department, and that he is familiar with the zoning ordinances. He testified that, in his opinion, live entertainment is not allowed in an F Zone. He suggested that given that restraint, adult establishments (such as adult bookstores and adult video stores) are permitted in an F Zone provided they do not have live entertainment. He was not questioned about the second ground stated in the March 21, 1997 letter revoking the Raven's Nest's August 1975 certificate of occupancy, namely, that "use as a cocktail lounge in 1975 required a special use permit and a public hearing."

John Paider ("Paider"), the Town's Deputy Commissioner of the Department of Planning and Development, also testified for the Town. Paider testified that he has worked for the Town in various capacities since 1969, including assistant town attorney, chief town attorney, and, eventually, town attorney, prior to assuming his present position. He testified that over those years he prosecuted cases under the Code and participated in drafting or amending various Code provisions. Specifically, he testified that the Town recodified its zoning ordinances in 1970, at which time the Town decided that live entertainment would be placed in G Zones, not F Zones. In this respect, he explained: "[T]he word 'theatre' was already in the F zone, and at that time during our recodification we reviewed the different ordinances as to what uses, more particularly, live entertainment, whether that would be placed in the code, and we determined that live entertainment would be placed at that time in a G zone as opposed to the F Zone." Transcript of Hearing, dated October 8, 1999 ("Tr."), at

81. Paider explained that in 1975, definitions of "cabaret" and "dinner theater" were added as a result of a case he tried in 1974 against the Oak Beach Inn, which was looking to open a "discotheque" in the Town. As a result of that case, he recommended that the Town add a definition to the Code for "cabaret" and consider definitions for "discotheque" and "dinner theater." The Town added a definition for "cabaret" in March 1975, allowing it as a use in a G Zone, but not in an F Zone. Paider maintained that "[the Town] spelled out the definition 'cabaret,' and once we said cabaret in a G zone they can never any longer fall into an F zone or similar—similar to a residential." Tr. 92.

Paider also testified that he was not aware of any theater in an F Zone that provided live entertainment, but was aware of one or two movie theaters in F Zones. Paider testified that he understood the term "theater" as referring to those having "a screen and a projector.... Anything that would be live stage shows I would classify as live entertainment, cabaret or possible dinner theater, discotheques...." Tr. 97. Paider further testified that he was not sure whether there were any topless bars or other adult entertainment in the Town, but maintained that in the past there have such places operating in the Town.

Paider testified that he construed the 1997 Information as charging that the Raven's Nest is not allowed in an F Zone and, as an alternative charge, that a cabaret is not allowed without at least a special use permit. He construed the March 21, 1997 letter revoking the Raven's Nest's August 1975 certificate of occupancy as similarly stating alternative grounds, i.e., that a cocktail lounge is not allowed in an F Zone and that, in any event, one is not allowed without at least a special use permit. In his opinion, the zoning inspector, Anthony Costanza ("Costanza"), who prepared the 1997 Information, "made a mistake" when he charged in the alternative that a cabaret is not allowed without at least a special use permit. Costanza was not called as a witness at the hearing by either side.

On cross-examination of Paider, Charette tried to show that John Venditto ("Venditto"), the town attorney when this action was brought and now the Town's supervisor, has been "engaged in a campaign to rid the [Town] of adult establishments." Tr. 107. In support of this contention, Charette introduced a campaign flyer supporting Venditto's candidacy in the Town supervisor's race. The flyer lists the names of six adult establishments—including the Raven's Nest—which had been operating in the Town; the word "CLOSED" is written prominently across the names and written below the names is the statement: "4 Adult Nightclubs and 2 X–Rated video stores have been *shut down*." Plaintiff's Exh. 3 (emphasis in original). Paider testified that he is not aware of any of those places being "closed down." Rather, he recalled that Club Ecstasy went out of business because of an "occupancy problem," and that Choices was closed because of building code violations (resulting from a case Paider prosecuted). He also stated that the Adult Video Store in Farmingdale was next to Club Ecstasy, apparently implying that it was closed for the same reasons as Club Ecstasy. He did not testify about the Finally Michael's Adult Club in Plainview or the Adult Video Store in Plainview, the remaining two establishments (other than the Raven's Nest) on the flyer.

Paider further testified that the Town conceded in the Second Circuit that if Charette sought a permit for the Raven's Nest in a G Zone, he would not have to go through the review process of a special use permit.

Upon this Court's questioning as to whether the Raven's Nest continually operated from 1975 until March 1997 (when its August 1975 certificate of occupancy was revoked), Paider testified that there was a state supreme court action to close the premises following the 1982 criminal proceedings against Charette and 24–A

Lounge; however, the senior deputy town attorney handling that matter died and the Town did not further pursue the matter.

Charette who was recalled as a witness, testified that the Raven's Nest continually operated from 1975 through 1986, when it was closed for 10 days for a liquor law violation. During 1986, the business was sold to MFB, and the Raven's Nest continued to operate providing topless dancing until March 1997.

The Town disputes Charette's assertion that he is ready to reopen the Raven's Nest, contending that, notwithstanding the dispute as to the special use permit requirements, there are other obstacles to Charette's ability to reopen the Raven's Nest. For instance, the Town suggested that there are code convictions that have never been cleared of record (apparently referring to MFB's conviction of the March 1997 charges for various building code, fire safety code, and electrical code violations), so that without the Town's inspection of the premises, the Town cannot know whether the violations still exist.

To show that the premises are ready to be reopened should the Court grant his motion, Charette offered testimony of an architect, Steven Cataldo ("Cataldo"), as to the current condition of the premises. Cataldo testified that he inspected the premises within the past week and found no problems with the structure. He testified that three entrance/exit doors on the structure were being enlarged at the time of his inspection; two had been completed and the third was being completed. He opined that the new doors were adequate to meet applicable Town codes. He further opined, based on his physical observation, that the ceiling beams were sufficient to sustain the load of the ceiling, but he acknowledged that he did not do any tests of the ceiling.

Charette was again recalled to testify, this time concerning the condition of the premises. Charette conceded that he only recently undertook the installation of the new doors and the repair of a crack in the wall of the so-called "8′ × 16′ addition" (referenced in the March 27, 1997 letter revoking the August 1975 certificate of occupancy), but claimed that he only recently learned that these changes and repairs were needed. Charette conceded that he never made an application to the Town for a permit concerning the so-called "addition," but he claimed that it was part of the original structure. However, when he was shown a purported survey of the premises (made at some earlier, unknown date) that did not show the "addition," he maintained that the "addition" was there when he took over the premises (apparently referring to when he took possession following MFB's eviction). He also conceded that he never made an application to the Town for a permit to repair the crack in the wall, which repair entailed removing and replacing cement blocks. Charette further testified that he made arrangements to have a fire detection system installed, and he recently had sufficient fire extinguishers delivered to the premises.

Paider, who was also recalled as a witness, testified that, in his opinion, a building permit is required when there is a change in the size of the doors of a structure.

## II. DISCUSSION

### A. Preliminary Injunction Standard

■ A party seeking a preliminary injunction generally must establish "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979). "However, in a case in which 'the moving party seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme,' the injunction should be granted only if the moving party meets the more rigorous likelihood-of-success standard." *Bery v.*

*City of New York,* 97 F.3d 689, 694 (2d Cir.1996) (quoting *Plaza Health Laboratories, Inc. v. Perales,* 878 F.2d 577, 580 (2d Cir.1989)).

On a motion for a preliminary injunction, "[v]iolations of First Amendment rights are commonly considered irreparable injuries." *Id.* at 693; *see Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). Nevertheless, "it often will be more appropriate to determine irreparable injury by considering what adverse factual consequences the plaintiff apprehends if an injunction is not issued." *Time Warner Cable v. Bloomberg L.P.,* 118 F.3d 917, 924 (2d Cir.1997).

## B. *First Amendment Principles*

■ As the Second Circuit observed, "[n]onobscene nude dancing performed as entertainment has expressive content that is protected by the First Amendment." *Charette,* 159 F.3d at 753; *see also City of Erie v. Pap's A.M.,* —— U.S. ——, ——, 120 S.Ct. 1382, 1391, 146 L.Ed.2d 265 (2000) ("nude [erotic] dancing . . . is expressive conduct, although we think it falls only within the outer ambit of the First Amendment") (O'Connor, J., plurality opinion); *id.* at 1410 ("nude dancing is a species of expressive conduct that is protected by the First Amendment") (Stevens, J., dissenting). As the Second Circuit further explained: "When a municipality has adopted a regulatory scheme that requires a business to obtain a permit to operate regardless of its location, that scheme must set objective standards governing the grant or denial of license applications, in order to ensure that the officials not have the 'power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers.'" *Charette,* 159 F.3d at 753 (quoting *City of Lakewood v. Plain Dealer Publishing Co.,* 486 U.S. 750, 759, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988)). "'[A] law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional.'" *Id.* (quoting *Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 150–51, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969)).

## C. *Analysis*

The parties do not dispute that the Raven's Nest is located in an F Zone, and that it operated as a cabaret providing live entertainment in the form of nonobscene nude or topless dancing. They also do not dispute that while the Code lists a number of specific factors that Town officials are to consider in determining whether to issue a permit for a cabaret, the Code also requires Town officials to withhold a permit on the basis of their views as to, *inter alia,* health, safety, and welfare. As the Second Circuit indicated, broad standards of this type have been held insufficient to pass First Amendment muster. *See id.* at 755, 108 S.Ct. 2138.

Charette principally argues that he is entitled to a preliminary injunction since no matter where the Raven's Nest is located, whether in an F Zone or a G Zone, the standards for a special use permit provided in § 246–18 are unconstitutional because Town officials may withhold a permit on the basis of their views as to, *inter alia,* health, safety, and welfare. He also argues that the Raven's Nest falls within the special use permit exception applicable to F Zones, i.e., § 246–239(A). Moreover, Charette argues that the Town should be barred under the doctrine of "judicial estoppel" from maintaining that a special use permit is not available to a cabaret in an F Zone because the Town had taken the earlier inconsistent position (in this action and in other proceedings) that a special use permit is available to a cabaret in an F Zone. *See, e.g., AXA Marine & Aviation Ins. (U.K.) Ltd. v. Seajet Indus. Inc.,* 84 F.3d 622, 628 (2d Cir.1996) ("A party invoking judicial estoppel must show that (1) the party against whom judicial estoppel is being asserted advanced an inconsistent

factual position in a prior proceeding, and (2) the prior inconsistent position was adopted by the first court in some manner."). To support these arguments, Charette primarily relies on the following: (1) the state court's finding that a cabaret is of the same general character of businesses listed as permitted uses in an F Zone and, therefore, such use would require a special use permit after a public hearing; (2) the Town's position earlier in this action that a special use permit is available to a cabaret but that one had not been sought or obtained by Charette; (3) Charette's testimony that live entertainment is provided in F Zones, and his argument that the plain language of the Code makes live entertainment permissible in an F Zone; (4) evidence that there is no X-rated entertainment in the Town; and (5) the flyer issued in Venditto's campaign for Town supervisor indicating that various adult establishments had been "CLOSED."

On the other hand, the Town primarily argues that Charette has failed to show that § 246–239(A) even applies to Charette's proposed use in an F Zone. In addition, in response to Charette's argument that the same standard would apply even if the Raven's Nest were located in a G Zone, the Town reiterates its concession that it would not apply the challenged permit provisions in the G Zone. At the hearing, the Town maintained, as it did on appeal, that the Code simply bans all live entertainment from F Zones. Thus, the Town argues that regardless of any determination as to the constitutionality (or unconstitutionality) of the challenged aspects of the special use permit provisions, Charette's intended use is not allowed in an F Zone and, therefore, he cannot seek or obtain a special use permit to operate the Raven's Nest as a cabaret providing any form of live entertainment in its present location. On appeal, the Second Circuit called the Town's assertion (that live entertainment is not allowed in an F Zone) questionable in light of the fact that the Code expressly allows some F Zone uses that could be interpreted as involving live entertainment, such as restaurants (defined to permit "dancing ... as an accessory and incidental use," § 246–1), and "theaters," § 246–239(A)(15), a term that in common parlance may refer both to buildings in which films are exhibited and to buildings in which live performances are given. The term "theaters" is not defined in the Code, and its meaning, which may be relevant to whether a permit may be granted under § 246–239(A)(23) on the basis that a cabaret is of the same general character as the theaters allowed in F Zones, is open to question.

*Charette*, 159 F.3d at 755–56.

■ Based on the record thus far developed, there is no evidence to suggest that "theaters," as used in the Code, includes those providing live entertainment. Indeed, the evidence concerning "theaters" shows that the Town has interpreted "theaters" to not include those providing live entertainment, and that there are no theaters providing live entertainment in any F Zone in the Town. Although the meaning of "theaters" as used in the Code may still be open to question, the record thus far does not suggest that term "theaters," as applied to an F Zone, encompasses those providing live entertainment, and Charette has not presented evidence to support a different interpretation of the Code.

Similarly, Charette has not presented evidence to suggest that the phrase "dancing ... as an accessory and incidental use," within in the definition of "restaurant," has been or should be interpreted to encompass live entertainment. There is no evidence in the record to indicate that "dancing" refers to dancing whereby patrons are entertained by dancers, rather than dancing by restaurant patrons as incidental to their dining. Nevertheless, it appears that the former is not covered by the definition because under that interpretation a restaurant providing dancers to entertain patrons would fall within the Code's definition of "cabaret." *See* Code

art. II, § 246–1 (defining "cabaret" as "[a]ny premises where, in conjunction with the sale or service of food and/or drink to the public, patrons are entertained by performers").

■ Although this Court is particularly troubled by the inconsistency between the Town's current position on this motion (that a special use permit is not available to a cabaret in an F Zone because live entertainment is not permitted in an F Zone) and its position earlier in this action (that a special use permit is available to a cabaret in an F Zone), Charette has offered little evidence to suggest that the F Zone uses specifically identified in the Code encompass live entertainment or to refute the Town's assertion that the Code was designed to exclude all live entertainment from F Zones, whether adult entertainment or otherwise. Indeed, the language of the Code and the evidence presented thus far suggest that the allowed F Zone uses do not include live entertainment, and, therefore, that a permit is not available under § 246–239A(23) for operation of a cabaret in an F Zone. Notably, although the state court concluded in the 1997 criminal proceedings that a cabaret is of the same general character as businesses listed as permitted uses in an F Zone, the record indicates that the Town alternatively contended in those proceedings that a cabaret is not an allowed use in an F Zone— a position it also maintained in the 1982 criminal proceedings. The credible evidence weighs towards the Town's contention that it has enforced the F Zone provisions as a ban on all live entertainment in F Zones. Although the state of the record makes it difficult for this Court to discern where in the spectrum between strict enforcement and lax enforcement the Town's effort in this respect really falls, the evidence presented thus far does not support the contention that the Town discriminatorily or selectively enforces this purported limitation against only adult entertainment. Rather, the evidence indicates that this prohibition has been enforced against a variety of establishments. Although the evidence indicates that certain establishments located in F Zones have attempted to, or have actually provided, live entertainment, it also indicates that the Town has enforced the Code provisions governing F Zones to ban live entertainment, and that it has enforced the Code in this manner for over a decade before this action was commenced and regardless of the nature of the entertainment. Under the circumstances, this Court does not believe that there is a sufficient basis for invoking judicial estoppel. Moreover, given the Town's concession that the challenged provisions cannot, and will not, be applied in G Zones, it does not appear that Charette can successfully claim that the Town unreasonably limits alternative avenues for the expressive conduct at issue. Because the record, as thus far developed, supports the Town's contention that the language of the Code does not allow for live entertainment in F Zones and that the Town has enforced the Code so as not to allow live entertainment in F Zones, this Court cannot say, at this time, that Charette is likely to succeed on the merits of his claim.

As for the likelihood of irreparable injury, this Court suggested the need for a hearing because the parties disputed, *inter alia,* whether, if an injunction were granted, the reopening of the Raven's Nest by Charette would be imminent. As the Second Circuit recognized, Charette's ability to reopen the Raven's Nest "may cast doubt on his contention that irreparable harm will result from his inability to reopen the Raven's Nest immediately." *Charette,* 159 F.3d at 757. At the hearing, Charette testified that he is ready, willing, and able to reopen the Raven's Nest, even without a liquor license. As for the dispute concerning Charette's efforts to secure a liquor license, Charette's representation that he is willing to open the Raven's Nest without a liquor license, if credited, makes this dispute irrelevant. At this point, there is no basis for rejecting Charette's representation; according-

ly, this Court accepts Charette's representation for purposes of this motion. However, the evidence suggests, although it is not clear, that the premises may not be in compliance with applicable codes, so that Charette's ability to operate the Raven's Nest may not be imminent, as he contends. Moreover, Charette's contention that he is ready and prepared to resume operations immediately is somewhat questionable in light of his testimony concerning steps taken only recently (nearly three years after this action was commenced) to prepare the premises for operation. Nevertheless, none of these concerns with the premises appear to be insurmountable within a reasonable time and with reasonable effort, and Charette does appear willing to remedy any of the Town's concerns with the structure. In any event, even assuming Charette has sufficiently shown that he will suffer irreparable injury for purposes of this motion, he has failed to show a likelihood of success on the merits. Accordingly, the motion is denied.

### III.  *CONCLUSION*

For the above reasons, Charette's motion for a preliminary injunction is denied.

SO ORDERED.