20-18-pr
*Green Haven Prison Preparative Meeting v. New York State Dept. of Corrections*

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term, 2020

Argued: October 30, 2020     Decided: October 18, 2021

Docket No. 20-18-pr

GREEN HAVEN PRISON PREPARATIVE MEETING OF THE RELIGIOUS SOCIETY OF FRIENDS, AN UNINCORPORATED ASSOCIATION, YOHANNES JOHNSON, INDIVIDUALLY, AND AS CLERK OF GREEN HAVEN PRISON PREPARATIVE MEETING, GREGORY THOMPSON, INDIVIDUALLY, AND AS MEMBER OF GREEN HAVEN PRISON PREPARATIVE MEETING, NINE PARTNERS QUARTERLY MEETING OF THE RELIGIOUS SOCIETY OF FRIENDS, AN UNINCORPORATED ASSOCIATION, DONALD BADGLEY, INDIVIDUALLY, AND AS CO-CLERK OF NINE PARTNERS QUARTERLY MEETING, EMILY BOARDMAN, INDIVIDUALLY AND AS CO-CLERK OF NINE PARTNERS QUARTERLY MEETING, BULLS HEAD-OSWEGO MONTHLY MEETING, AN UNINCORPORATED ASSOCIATION, CAROLE YVONNE NEW, INDIVIDUALLY AND AS CLERK OF BULLS HEAD-OSWEGO MONTHLY MEETING, DAVID LEIF ANDERSON, INDIVIDUALLY AND AS TREASURER OF BULLS HEAD-OSWEGO MONTHLY MEETING, POUGHKEEPSIE MONTHLY MEETING, AN UNINCORPORATED ASSOCIATION, FREDERICK DONEIT, SR., AS TREASURER OF POUGHKEEPSIE MONTHLY MEETING, JULIA GIORDANO, MARGARET L. SEELY, SOLANGE MULLER, NEW YORK YEARLY MEETING OF THE RELIGIOUS SOCIETY OF FRIENDS, INC.,

*Plaintiffs-Appellants,*

— v. —

NEW YORK STATE DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION,

ANTHONY ANNUCCI, IN HIS CAPACITY AS ACTING COMMISSIONER OF THE DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION, JEFF MCKOY, IN HIS CAPACITY AS THE DEPUTY COMMISSIONER FOR PROGRAM SERVICES OF THE DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION, ALICIA SMITH-ROBERTS, IN HER CAPACITY AS THE DIRECTOR OF MINISTERIAL, FAMILY AND VOLUNTEER SERVICES OF THE DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION, JAMIE LAMANNA, IN HIS CAPACITY AS SUPERINTENDENT OF GREEN HAVEN CORRECTIONAL FACILITY, JAIFA COLLADO, IN HER CAPACITY AS DEPUTY SUPERINTENDENT OF PROGRAMS AT GREEN HAVEN CORRECTIONAL FACILITY, MARLYN KOPP, IN HER CAPACITY AS DEPUTY SUPERINTENDENT OF PROGRAM SERVICES AT GREEN HAVEN CORRECTIONAL FACILITY

*Defendants-Appellees.*[*]

———————

B e f o r e:

LIVINGSTON, *Chief Judge*, CABRANES, and LYNCH, *Circuit Judges.*

———————

Several unincorporated associations and individual members of the Religious Society of Friends (widely referred to as "Quakers") appeal from an order of the United States District Court for the Southern District of New York (Karas, *J.*) denying their motion for a preliminary injunction directing defendant officials of the New York State Department of Corrections and Community Supervision to rescind changes in the scheduling of certain regularly-held Quaker religious gatherings at Green Haven Correctional Facility. We agree with the district court that a preliminary injunction is not warranted because Plaintiffs-Appellants are unable to demonstrate a likelihood of success on the merits of their claims. The order of the district court is thus **AFFIRMED**.

———————

[*] The Clerk of the Court is respectfully directed to amend the caption as set forth above.

1

FREDERICK R. DETTMER, Law Office of Frederick R. Dettmer, New Rochelle, NY, *on the brief, for Plaintiffs-Appellants.*

MARK S. GRUBE, Assistant Solicitor General, State of New York, New York, NY (Letitia James, Attorney General, Barbara D. Underwood, Solicitor General, Anisha S. Dasgupta, Deputy Solicitor General, *on the brief*), *for Defendants-Appellees.*

—————————

GERARD E. LYNCH, *Circuit Judge*:

This case arises from scheduling changes made by the New York State Department of Corrections and Community Supervision ("DOCCS") to certain regularly-held religious gatherings of the Religious Society of Friends, generally known as "Quakers," at Green Haven Correctional Facility ("Green Haven"). DOCCS's measures affected the scheduling of two types of Quaker religious gatherings. The first type, called Quarterly Meetings, are held four times a year and involve neighboring Quaker communities gathering at Green Haven to worship with inmates. The second type, referred to as "meetings for worship with a concern for business" ("MFWCBs"), are weekly meetings where inmates at Green Haven who participate in Quaker activities discuss the group's business concerns. The scheduling changes generally prevented inmates from holding

2

these meetings on their preferred days of the week. Plaintiffs-Appellants, who include both Quaker prisoners Yohannes Johnson and Gregory Thompson (the "Incarcerated Plaintiffs") and outside Quaker individuals and organizations who participate in communal worship with the Incarcerated Plaintiffs ("the Non-Incarcerated Plaintiffs") (together, "Plaintiffs") brought this action in the United States District Court for the Southern District of New York challenging the scheduling changes, and moved for a preliminary injunction. Plaintiffs sought to direct Defendants-Appellees, who include DOCCS and several DOCCS and Green Haven officials (collectively, "Defendants"), to reinstate the meetings at their previously scheduled times.

The district court (Kenneth M. Karas, *J.*) concluded that the Incarcerated Plaintiffs were unable to demonstrate a likelihood of success on the merits of their claims, in part because they failed to comply with the Prison Litigation Reform Act's ("PLRA's") requirement to exhaust administrative remedies and failed to demonstrate that they qualified for an exception to the exhaustion mandate. The court further concluded that all Plaintiffs failed to show that the scheduling changes imposed a substantial burden on their religious exercise. We conclude that the district court did not err in denying the preliminary injunction.

3

## I.  Quaker Meetings

Adherents of the Quaker faith, formally referred to as "Friends," believe that a person can convene directly with God without a mediator (such as a priest, minister, or other member of the clergy) and that a group of individuals form a congregation when they worship together and submit their independent religious revelations and insights to collective discernment at periodic meetings for worship.[1] Friends who meet and worship together regularly as a congregation may organize themselves into a formal group known as a "Monthly Meeting." A Monthly Meeting is responsible for local matters of business, including organizing worship services, managing membership applications and lists, approving and overseeing marriages, and providing pastoral care. A Monthly Meeting conducts institutional business at specially-convened gatherings called "meetings for worship with a concern for business."

A Monthly Meeting may include multiple congregations which regularly hold their own separate worship services. Such constituent congregations may be

---

[1] Here and throughout this opinion, we base our understanding of Quaker belief and practice on materials submitted in the record by Plaintiffs.

organized as "Worship Groups" called "Preparative Meetings."[1] Two or more

Monthly Meetings and Worship Groups in the same region may form a Quarterly

Meeting, which meets four times a year, and two or more Quarterly Meetings in a

larger area may unite to form a Yearly Meeting, which meets annually. Friends

form Quarterly and Yearly Meetings to "gather for the spiritual enrichment

available from a larger body and to conduct business together." Appellants' Br. at

7. In pursuit of meaning and truth through collective deliberation and consensus,

Friends use these larger meetings to test and discuss with a broader group

insights from their smaller local Meetings.

## II.    Quaker Meetings at Green Haven

Green Haven is a maximum security correctional facility that houses

approximately 1900 inmates with diverse religious affiliations. Formed in 1976,

Plaintiff Green Haven Prison Preparative Meeting ("Green Haven Meeting") is

the organized Quaker Worship Group at Green Haven; its approximately eight

members, including the Incarcerated Plaintiffs, are all prisoners there. Before the

implementation of the changes at issue in this appeal, the group met three times a

---

[1] Unlike a Monthly Meeting, a Preparative Meeting "does not have final authority to receive, transfer, or dismiss members, or to perform marriages." J. App'x at 138.

week: Thursday evenings in a study group from 6:00 p.m. to 8:30 p.m. in Building 12 led by a civilian volunteer, Friday evenings for worship from 6:00 p.m. to 8:30 p.m. in the J School led by a civilian volunteer, and Saturdays from 12:30 p.m. until about 2:00 p.m. for MFWCBs in the J School led by Incarcerated Plaintiff Johnson, who was the designated inmate facilitator.[2] Green Haven Meeting also held Quarterly Meetings four times a year on Saturdays for approximately six hours, starting in the morning and ending in the mid-afternoon.

Green Haven Meeting, Poughkeepsie Monthly Meeting, Bulls Head-Oswego Monthly Meeting and other Quaker meetings in the region belong to Nine Partners Quarterly Meeting ("Nine Partners Quarter"). Poughkeepsie Monthly Meeting, Bulls Head-Oswego Monthly Meeting, and Nine Partners Quarter are not-for-profit unincorporated associations and are Non-Incarcerated Plaintiffs. New York Yearly Meeting, a not-for-profit corporation and also a Non-Incarcerated Plaintiff, is an umbrella organization for all Meetings and worship groups throughout New York and parts of Connecticut and New Jersey. New

---

[2] A facilitator is an inmate designated by DOCCS to serve as the representative of the faith group in the absence of a competent chaplain.

York Yearly Meeting, the unincorporated associations of non-incarcerated

Quakers, and eight individual members of those associations join the

Incarcerated Plaintiffs in appealing the district court's order denying the

preliminary injunction.

## III.    Regulatory Framework

DOCCS Directive 4202, titled "Religious Programs and Practices," sets

forth DOCCS's policy for the promotion of religious experiences of persons

under its supervision. "[I]n recognition of the First Amendment right of 'religious

liberty,'" the policy aims "to provide as many opportunities as feasible for the

practice of [inmates'] chosen faiths, consistent with the safe and secure operations

of the DOCCS correctional facilities." J. App'x 573. Directive 4202 § VI(B)(2)

discusses two types of regularly scheduled religious gatherings: worship services

and educational gatherings. Additional special religious holy days, celebrations,

or observances are governed by § VII and the Religious Holy Day Calendar,

which is distributed annually. Directive 4202 § VI(B)(2) allows faiths with six to

ten requesting adherents to hold religious gatherings such as classes or study

groups twice a month subject to the availability of space and staffing. The

Superintendent may also approve additional gatherings "if the accommodation

7

can be made without incurring any additional costs/resources." J. App'x at 576.

Pursuant to Directive 4750, titled "Volunteer Services Program," civilian religious volunteers must be registered in order to be permitted into correctional facilities to assist in programs.

Plaintiffs do not challenge the reasonableness of these system-wide regulations. Rather, their complaint concerns the specific implementation of the regulations at Green Haven with respect to Quaker gatherings at the prison, starting in 2015.

## IV.    Policy Changes

In the fall of 2014, following a spate of security breaches involving visitors smuggling in weapons, cash, and contraband, and in at least one instance a corrections officer taking a bribe to smuggle a pound of marijuana to Green Haven inmates, the Acting Commissioner of DOCCS, Defendant Anthony Annucci, installed new Green Haven administrators, including a new Superintendent and several new Deputy Superintendents, including Defendant Jaifa Collado ("Collado") who was Deputy Superintendent for Program Services at Green Haven and responsible for scheduling religious and other activities. The

8

security concerns prompted the new administration to reevaluate special events and other gatherings held in the facility.

*A. Quarterly Meetings*

For 35 years, from 1980 to 2015, Green Haven Meeting hosted Friends from Nine Partners Quarter at Green Haven for full-day Quarterly Meetings. Those meetings, which typically took place over six or more hours on Saturdays and included lunch, allowed Quaker inmates and non-incarcerated Friends in the region to worship together and exchange beliefs, practices and concerns. Quarterly Meetings also provided inmates who were not members of the Green Haven Meeting an opportunity to participate in and be introduced to the Quaker religion. Plaintiffs contend that holding these Quarterly Meetings on Saturdays, as opposed to any other day of the week, is "critical to their success" because on Saturdays non-incarcerated Friends are less limited by work schedules, parental obligations, evening travel, and other workweek commitments. J. App'x at 216.

Special events – including Quaker Quarterly Meetings – typically require the presence of extra security staff to protect the non-incarcerated visitors and volunteers who may attend the events and to maintain safety for the general prison population. In light of ongoing security concerns raised by the security

9

breaches in the fall of 2014, the new prison administration sought to reduce the size and number of special events at Green Haven, and special events held on weekends in particular, since the staff on weekend duty is smaller and the prison would have to pay overtime to adequately staff events. Special events also increase "out counts," the number of inmates away from their cells when a count of inmates occurs. Prison administration sought to reduce the out count since the absence of inmates from the count carries security risks associated with tracking inmate movement. As a result, in 2015, Green Haven administration moved Quarterly Meetings from Saturdays to Friday evenings after 5:30 p.m.

In 2014, Green Haven Meeting hosted Saturday Quarterly Meetings – which were scheduled on the special events calendar – on March 29, June 7, September 13 and December 27 from 8:30 a.m. to 2:30 p.m. Visitors were prohibited from bringing food, beverages, packages, or gifts into the facility. Green Haven provided food for the Quarterly Meetings in the form of "offline meals," which are meals from the mess hall's regular menu. All registered Quaker inmates, who numbered from six to nine at the relevant times, were allowed but not required to attend these Quarterly Meetings. Green Haven also allowed 15 registered civilian volunteers to attend the March, June and

10

September Quarterly Meetings. After noticing that only a few of the volunteers actually attended the Quarterly Meetings, and in light of ongoing security concerns about events including a large number of civilians, prison administration limited the maximum number of guests at the December 27, 2014 Quarterly Meeting to any four from the list of registered volunteers.

Thaddeus Davis ("Davis"), the designated facilitator for Quaker inmates at Green Haven before Plaintiff Johnson took over that role, corresponded with prison administration about, inter alia, his four proposed dates for the 2015 Quarterly Meetings, which were all Saturdays. In one of her responses, Collado requested an explanation for Davis's request for four Quarterly Meetings per year since, according to the approved special events calendar, the Quakers had no special holy days in 2014 other than the common Christian holidays of Easter and Christmas. In a response memo, Davis explained Quaker practices and the religious significance of Quarterly Meetings, but he did not identify any particular significance to holding the Quarterly Meetings on Saturdays.

Green Haven officials determined that it was not possible to implement the preferred schedules for all religious denominations in the community given "security concerns" and "logistical considerations" at the prison. J. App'x at 540.

11

Thus, prison administration moved the Quarterly Meetings to Friday evenings, after 5:30 p.m., and distributed the 2015 special events calendar with Quarterly Meetings scheduled for March 20, June 5, September 11, and December 11. Green Haven Meeting objected to the move, in part, because it already held worship services from 6:00 p.m. to 8:30 p.m. on Friday evenings. Prison administration offered to move the Quarterly Meetings to another weekday evening, but Green Haven Meeting declined the offer. As a result, the Quarterly Meetings were removed from the special events calendar in the years following 2015. Since then, DOCCS and Green Haven Meeting have negotiated about the Quarterly Meetings, which has resulted in DOCCS offering to schedule one of the Quarterly Meetings as a special event, with an out count that would permit a longer meeting along with a meal paid for by the Quakers.

B. *MFWCBs*

Green Haven also made changes that affected MFWCBs. Green Haven Meeting would typically hold MFWCBs on Saturdays from 12:30 p.m. to about 2:00 p.m. in the J School. Incarcerated Plaintiff Johnson facilitated these meetings, which were attended by inmates who had to "call out," or in other words, receive permission in advance to be away from their cells in order to attend. Correctional

12

officers must accompany an inmate who has called out from his cell to the location of the event, where one or more other correctional officers must stay to monitor the inmate throughout the event.

Defendant Marlyn Kopp ("Kopp") succeeded Collado as Deputy Superintendent for Program Services at Green Haven in March 2017. By January 2018, Kopp and other administrators identified overcrowding as an issue in the J School building, where some Quaker activities were held. The overcrowding stemmed in part from too many call outs by non-Quaker inmates, including several maximum security inmates, attending call-out gatherings such as Green Haven Meeting's MFWCBs. On January 6, 2018, for instance, 21 inmates attended the MFWCB, 9 of whom were registered Quakers and 12 of whom were not registered Quakers. The unusually high ratio of non-Quakers to Quakers prompted Kopp to take action to reduce what officials perceived to be excessive call outs, which she deemed were more likely to be subject to abuse since no chaplain or community volunteer was present.[3]

---

[3] Section VI(B)(3) of Directive 4202 limits inmates to attending up to three services or classes per year of religions other than the one for which they are registered in order to "learn more about the religious practices of another faith" (hereinafter, the "Three Times Rule").

On February 9, 2018, Johnson corresponded with Green Haven administration in response to an inquiry about the purpose of the MFWCB and irregularities in the attendance of non-adherents. Kopp responded by informing Johnson of her decision to revoke permission for MFWCBs. She wrote, in part, "The Quakers, just like any other religion, are already approved to have worship services and study classes. They have Friday Worship and Thursday [b]ook study. The Saturday call-out does not appear to be a study group or a worship service and therefore does not appear necessary. With a congregation of a total of 8 inmates, having a Thursday study group and Friday worship service appears to be sufficient." J. App'x at 560.

*C. The Holy Day Calendar*

Separate from the regular weekly religious activities, DOCCS prepares and distributes a Religious Holy Day Calendar applicable to all of its correctional facilities, which identifies dates of religious significance throughout the year. The administration of an individual correctional facility, however, may schedule additional religious activities for the various faith groups within each facility. Plaintiffs object to the DOCCS Calendar's identification of the Society of Friends as "Protestant" and the designation of Pentecost as the "Family Event" day for

14

the Society of Friends, along with other groups characterized as Protestant. A Family Event Day enables outside family and friends to join inmates of their faith for worship and celebration. Plaintiffs argue that Quakers do not celebrate Pentecost and that DOCCS is unjustified in its refusal to revise the Calendar to add Quarterly Meetings.

## V.     District Court Proceedings

The Incarcerated Plaintiffs did not file administrative grievances about any of the rule changes concerning the various Quaker meetings at Green Haven. Instead, Plaintiffs filed the present complaint in September 2018, bringing claims under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc et seq., the Free Exercise Clause of the First Amendment, the Establishment Clause of the First Amendment, the Equal Protection Clause of the Fourteenth Amendment, the freedom of religion guarantees in the New York State Constitution, art. I, § 3, and New York Correction Law § 610(1), which guarantees to inmates "the free exercise and enjoyment of religious profession and worship, without discrimination or preference."

In particular, as concerning their RLUIPA claim, the Incarcerated Plaintiffs allege that Defendants' termination of and refusal to reinstate Quarterly Meetings

15

and MFWCBs imposes a substantial burden on their exercise of religion and is neither in furtherance of a compelling government interest nor the least restrictive means of furthering any such interest. They also asserted claims under the Free Exercise Clause of the First Amendment (and corresponding claims under Section 610 of the New York Correction Law), alleging, in relevant part, that Defendants' cancellation of Quarterly Meetings and MFWCBs imposes a substantial burden on their sincerely held religious beliefs and religious exercise and is not reasonably related to legitimate penological interests. Finally, they alleged that Defendants' actions – including their designation of Quakers as "Protestants" and celebrants of Pentecost – violate the Establishment Clause.[4]

The Non-Incarcerated Plaintiffs asserted claims under the Free Exercise Clause of the First Amendment, alleging that Defendants' cancellation of Quarterly Meetings deprived them of their ability to exercise their religion, a deprivation not reasonably related to legitimate penological interests.

All plaintiffs also asserted corresponding claims under the Free Exercise Clause of the New York State Constitution. Finally, all plaintiffs asserted a claim

---

[4] The Incarcerated Plaintiffs also raised separate claims for "retaliation," alleging that Defendants' decision to terminate the MFWCBs were retaliatory and were intended to deter the Incarcerated Plaintiffs from "vindicating" their rights. J. App'x 317.

16

under the Equal Protection Clause of the Fourteenth Amendment, alleging that DOCCS allows other unspecified faith groups to hold religious events that "are the equivalent of" Quarterly Meetings and MFWCBs. J. App'x at 314. Plaintiffs sought an order directing Defendants to reinstate MFWCBs and Saturday meeting times for Quarterly Meetings at Green Haven Correctional Facility.

Plaintiffs moved for a preliminary injunction on March 29, 2019. The district court heard oral argument on October 30, 2019 and denied the motion orally at the conclusion of the hearing. The district court concluded that the deprivation of religious rights alleged by Plaintiffs was sufficient to establish irreparable harm but Plaintiffs were unable to show a likelihood of success on the merits. First, the district court held that the Incarcerated Plaintiffs' claims were unlikely to succeed because those plaintiffs had failed to exhaust their administrative remedies. Further, the court determined that none of the plaintiffs had shown that the actions of prison administration placed a "substantial burden" on their religious rights. J. App'x at 907. A written order denying the motion was filed the same day. Plaintiffs moved for reconsideration, which was denied on December 3, 2019.

## DISCUSSION

### I. Standards of Review

We review a district court's denial of a preliminary injunction for abuse of discretion, examining the legal conclusions underpinning the decision *de novo* and the factual conclusions for clear error. *County of Nassau v. Leavitt*, 524 F.3d 408, 414 (2d Cir. 2008); *Charette v. Town of Oyster Bay*, 159 F.3d 749, 755 (2d Cir. 1998). We review *de novo* whether a plaintiff has exhausted administrative remedies under the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a). *Amador v. Andrews*, 655 F.3d 89, 95 (2d Cir. 2011).

A plaintiff "seeking a preliminary injunction must ordinarily establish (1) irreparable harm; (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party; and (3) that a preliminary injunction is in the public interest." *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015) (internal quotation marks omitted), citing *Oneida Nation of N.Y. v. Cuomo*, 645 F.3d 154, 164 (2d Cir. 2011). The PLRA requires that any preliminary injunctive relief concerning prison conditions "be narrowly drawn, extend no

18

further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2). In weighing a request for preliminary injunctive relief, "[t]he court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief." *Id.*

## II. Standing

Before turning to the merits of the appeal, we address the threshold issue of standing. Because the question of standing goes to the constitutional limitations on the "judicial Power of the United States," which is limited to resolving "Cases" or "Controversies," U.S. Const. art. III, we"are entitled at any time *sua sponte* to delve into the issue" of standing even if defendants do not raise the issue. *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., Div. of Ace Young Inc.*, 109 F.3d 105, 108 (2d Cir. 1997).

### A. *Non-Incarcerated Plaintiffs' Standing*

Plaintiffs assert that the Non-Incarcerated Plaintiffs have constitutional rights in the prison setting which were infringed upon by Green Haven's policy changes and that the organizational Non-Incarcerated Plaintiffs have standing to represent the constitutional rights of their parishioner-members. We agree.

19

At the preliminary injunction stage, "a plaintiff's burden to demonstrate standing will normally be no less than that required on a motion for summary judgment. Accordingly, to establish standing for a preliminary injunction, a plaintiff cannot rest on . . . mere allegations . . . but must set forth by affidavit or other evidence specific facts" that establish the "three familiar elements of standing: injury in fact, causation, and redressability." *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011) (internal quotation marks and citation omitted).

Here, the Non-Incarcerated Plaintiffs allege injury on the ground that the prison administration's scheduling changes and treatment of the Society of Friends in the Religious Holy Day Calendar, which they characterize as the "eliminat[ion]" of "entire programs of a church," adversely impact their First Amendment rights. Appellants' Br. at 22. Defendants do not challenge the sufficiency of these harms to establish standing. In the prison context, the Supreme Court has recognized the rights of non-incarcerated individuals under other provisions of the First Amendment. *See Thornburgh v. Abbott*, 490 U.S. 401, 408 (1989) ("[T]here is no question that publishers who wish to communicate with those who, through subscription, willingly seek their point of view have a legitimate First Amendment interest in access to prisoners.").

20

Not all of the changes in Green Haven's practices that are challenged in this case affect the Non-Incarcerated Plaintiffs, however. As far as the record reflects, the weekly Saturday MFWCBs have never been attended by outsiders and involve only Green Haven inmates. While the Non-Incarcerated Plaintiffs are understandably distressed by restrictions on their incarcerated co-religionists' opportunities to conduct MFWCBs and by the Green Haven administrators' arguably brusque and incurious response to the Quaker inmates' effort to explain the religious function of these meetings, the Non-Incarcerated Plaintiffs themselves are not directly affected by any changes in the frequency of religious services that they do not attend and claim no right to attend.

The Quarterly Meetings, on the other hand, are a different matter. The well-pleaded allegations of the complaint allege that Quarterly Meetings at which members of affiliated regional Preparative or Monthly Meetings gather play a significant role in Quaker religious practice, and the Green Haven authorities have for many years allowed non-incarcerated visitors to attend. The different injuries alleged flow directly from the challenged policy changes, and could be redressed by an injunction reversing those changes. Accordingly, we are satisfied that the Non-Incarcerated Plaintiffs have alleged injuries to their constitutional

21

rights sufficient to confer Article III standing to challenge the scheduling changes with respect to the Quarterly Meetings.

B.    *Green Haven Meeting Standing*

Plaintiffs further argue that Green Haven Meeting has associational standing to pursue both constitutional and statutory claims as an unincorporated association. Defendants "do not contest Green Haven Preparative Meeting's standing to sue based on the alleged injuries to its members." Appellees' Br. 25 n. 9.  "It is common ground that . . . organizations can assert the standing of their members." *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009). However, Defendants argue that Green Haven Meeting lacks standing as an institution, independent of its members' standing, to challenge the changed Green Haven policies because it is not a "person residing in or confined to an institution" under RLUIPA. 42 USC § 2000cc-1(a). That argument is really a merits question about the scope of RLUIPA's protections, which we address below.

We conclude that the Non-Incarcerated Plaintiffs have Article III standing to challenge the policy changes relating to the Quarterly Meetings, and Green Haven Meeting has Article III standing to challenge all the policy changes. And of course, in any event, the individual Incarcerated Plaintiffs unquestionably

22

have Article III standing to challenge all of the policy changes at issue.

Accordingly, we have jurisdiction to address the merits of Plaintiffs' claims, and

we thus turn to the merits of the appeal.

## III.    Irreparable Harm to Plaintiffs

In order to obtain a preliminary injunction, Plaintiffs must show that they

are likely to suffer irreparable harm in the absence of injunctive relief. The district

court correctly found that there is "no question" that the injury alleged by

Plaintiffs satisfies the irreparable harm requirement. Sp. App'x at 11. "The loss of

First Amendment freedoms, for even minimal periods of time, unquestionably

constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality

opinion). We thus conclude that, at least insofar as they challenge substantive

restrictions on their ability to conduct religious services and meetings in

accordance with their beliefs, Plaintiffs have established that any violation of

their religious liberties would satisfy the irreparable injury standard.[5]

## IV.        Likelihood of Success on the Merits

---

[5] To the extent that Plaintiffs seek to challenge portions of DOCCS's Holy Day Calendar, Plaintiffs have waived any such challenge because their request for injunctive relief below did not specifically seek an order that DOCCS alter the calendar. *See Anderson Grp., LLC v. City of Saratoga Springs*, 805 F.3d 34, 50 (2d Cir. 2015).

23

We consider next whether Plaintiffs are likely to succeed on the merits of their claims, a prerequisite for obtaining a preliminary injunction and the basis of the district court's denial of Plaintiffs' injunction. First, we consider whether, pursuant to the PLRA, the Incarcerated Plaintiffs exhausted their administrative remedies prior to seeking relief in the district court. Next, we consider whether Plaintiffs have otherwise shown a likelihood of success on the merits of their claims. Plaintiffs principally challenge the policy changes under the Free Exercise clause of the First Amendment and RLUIPA.[6]

### A.  Legal Framework

---

[6] Plaintiffs allege claims under the Establishment Clause of the First Amendment, the Equal Protection Clause of Fourteenth Amendment, and state law. However, although they recite the applicable legal standards for assessing the constitutionality of state actions under the constitutional provisions, they make no argument applying those standards to the facts of this case that are separate from or independent of their arguments under the Free Exercise Clause and RLUIPA, and do not explain why they are entitled to a preliminary injunction on those claims. Appellants' Br. 31-34. Moreover, they make no attempt to address their claims under New York state law.  Accordingly, those arguments have been waived for purposes of this appeal, and we do not consider them in addressing Plaintiffs' entitlement to a preliminary injunction.

Under the PLRA, "a prisoner confined in any jail, prison, or other correctional facility" may not bring an action "with respect to prison conditions . . . until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Under RLUIPA, "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . unless the government demonstrates that imposition of the burden on that person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."42 U.S.C. § 2000cc-1(a). The Free Exercise Clause of the First Amendment, which is applicable to the States through the Fourteenth Amendment, prohibits the government from making a law "prohibiting the free exercise" of religion. *Cruz v. Beto*, 405 U.S. 319, 322 (1972).

B.      *The Incarcerated Plaintiffs: Exhaustion of Administrative Remedies*

The Incarcerated Plaintiffs, as "prisoner[s] confined in any . . . correctional facility," 42 U.S.C. § 1997e(a), are subject to the exhaustion requirements of the PLRA. The PLRA requires "proper exhaustion" of administrative remedies, meaning exhaustion in "compliance with an agency's deadlines and other critical procedural rules," *Woodford v. Ngo*, 548 U.S. 81, 90 (2006), "using all steps that the

agency holds out, and doing so properly." *Amador*, 655 F.3d at 96 (internal

quotation marks omitted). The PLRA requires the exhaustion of remedies only

insofar as such remedies are "available to the inmate." *Hubbs v. Suffolk County*

*Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015) (internal quotation marks omitted).

"An administrative procedure is unavailable when (1) it operates as a simple

dead end – with officers unable or consistently unwilling to provide any relief to

aggrieved inmates; (2) the scheme is so opaque that it becomes, practically

speaking, incapable of use, meaning that some mechanism exists to provide

relief, but no ordinary prisoner can discern or navigate it; or (3) when prison

administrators thwart inmates from taking advantage of a grievance process

through machination, misrepresentation, or intimidation." *Hayes v. Dahlke*, 976

F.3d 259, 268 (2d Cir. 2020) (internal quotation marks omitted).

DOCCS regulations establish a three-step Inmate Grievance Program

("IGP") consisting of: (1) a complaint to the Inmate Grievance Resolution

Committee (the "IGRC") at the individual correctional facility; (2) an appeal to

the facility's superintendent; and (3) a further appeal to the Department's Central

Office Review Committee ("CORC"). *See* N.Y. Comp. Codes R. & Regs.

("N.Y.C.R.R.") tit. 7, §§ 701.1(c), 701.5(a)-(d). The parties agree that the

Incarcerated Plaintiffs failed to take any of these steps. Indeed, neither Johnson nor Thompson nor anyone else from Green Haven Meeting filed a complaint with the IGP clerk regarding the availability of religious gatherings, much less pursued such grievance through the final level of review provided by DOCCS's IGP. At issue here is whether they should be required to do so. We hold that they are.

Plaintiffs argue, based on language in DOCCS's IGP (Directive 4040) §701.3(d) that excludes claims brought on behalf of a class of prisoners, that the administrative procedures were not available to them because DOCCS's grievance process does not apply to a matter which affects a class of inmates. The district court was unpersuaded by that argument. *See* Sp. App'x at 13-14. We similarly find it unavailing.

Directive 4040 states that individuals "personally affected by a matter which affects a class of inmates may only file a grievance on their own behalf." N.Y.C.R.R. tit. 7, § 701.3(d). As the district court correctly found, this language makes clear that an individual prisoner may still file a grievance on his own behalf, even if other prisoners could benefit from the outcome. That inmates may not pursue actions formally designated as class actions does not mean that they

27

may not pursue grievances "on their own behalf,"even if their success could benefit others; to the contrary, the regulations specifically provide that they may. And if, under the DOCCS regulations, they may, then, under the PLRA, they must. *See Ngo*, 548 U.S. at 85 (noting that the PLRA "strengthened" the exhaustion requirement and that exhaustion of remedies is "mandatory").

Plaintiffs also appear to make a futility argument, claiming that the grievance process was "a dead end" such that they were not required to exhaust administrative remedies. Appellants' Br. at 52-53. The bar for the availability of remedies, however, is low. To constitute an "available" remedy, a process requires only "the *possibility* of some relief." *Ross v. Blake*, 136 S. Ct. 1850, 1859 (2016) (emphasis added) (quotation marks omitted). Here, the Incarcerated Plaintiffs provide no evidence that a grievance asserting that a prisoner's religious liberty has been violated by a limitation on the number or timing of religious services or celebrations could not lead to a change in the challenged prison policies. Plaintiffs are thus unable to avoid the exhaustion requirement, and the Incarcerated Plaintiffs' RLUIPA claims fail.

Nor can the Incarcerated Plaintiffs avoid the exhaustion requirement by suing under the banner of Green Haven Meeting, of which they are members.

28

Plaintiffs argue that Green Haven Meeting is an institutional entity distinct from its individual members, and that, under RLUIPA, it is a "person" whose religious exercise cannot be substantially burdened absent a compelling government interest. But they also contend that at the same time, Green Haven Meeting is not a "prisoner" within the meaning of the PLRA and thus is not bound by the exhaustion mandate. Plaintiffs rely on *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014), in support of their argument. However, while *Burwell* held that a for-profit corporation had standing to assert religious rights, it did not involve either a prison setting or an unincorporated association of individuals, and did not discuss an organization's obligations to exhaust administrative remedies under the PLRA. It is thus of little utility in answering the question before us.

The problem with Plaintiffs' attempt to avoid the PLRA's exhaustion requirement is that it attempts to whipsaw the relevant statutes (RLUIPA and the PLRA) in a manner that vitiates the PLRA's requirements. Moreover, their argument ignores the full context of the word "person" in RLUIPA. We can readily agree that Green Haven Meeting is a "person" within the meaning of RLUIPA; the Dictionary Act, 1 U.S.C. § 1, provides that "[i]n determining the meaning of any Act of Congress, unless the context indicates otherwise[,] . . . the

29

word[ ] "person" . . . include[s] . . . associations . . . as well as individuals." But the relevant portion of RLUIPA does not grant rights to all "persons." Rather, it applies to "person[s] residing in or confined to an institution." 42 U.S.C. § 2000cc-1(a). To the extent that Green Haven Meeting can be, for statutory purposes, a "person," it plainly is not the kind of person that can "resid[e] in or [be] confined to an institution." *Id.* An incorporeal entity cannot be imprisoned, even if all of its human members are prisoners. To whatever extent one might metaphorically consider an association composed entirely of prisoners to reside, in some sense, in prison, it derives that status entirely from the status of its members. The action brought by Green Haven Meeting is brought to vindicate the rights of its members, and those members, as prisoners, are bound by the requirements of the PLRA. In short, the Incarcerated Plaintiffs may not avoid the exhaustion requirement simply by forming an organization and then suing in the name of that organization.

Accordingly, the claims of Green Haven Meeting, as well as those of the Incarcerated Plaintiffs suing in their own names, must be dismissed for failure to exhaust administrative remedies. We thus turn to the claims of the Non-Incarcerated Plaintiffs.

## C.     *The Non-Incarcerated Plaintiffs*

As discussed above, the Non-Incarcerated Plaintiffs make no claims under RLUIPA, nor can they, not being "person[s] residing in or confined to an institution." 42 U.S.C. § 2000cc-1(a). Moreover, they lack standing to raise claims on any theory relating to the limitation of the MFWCBs, which they have not attended and which they claim no right to attend, and they have not pressed on appeal their claims under the Establishment Clause, the Equal Protection Clause, or state law. Accordingly, we confine our discussion to their claims that the changes in the times of the Quarterly Meetings, and the eventual cancellation of those meetings, infringed their rights under the Free Exercise Clause of the First Amendment.

In their briefs on appeal, Plaintiffs do not clearly distinguish between the Free Exercise claims of the Incarcerated and Non-Incarcerated Plaintiffs, arguing generally that the undifferentiated "*Plaintiffs* [s]uffered a '[s]ubstantial [b]urden'" on their religious practice. Appellants' Br. at 40 (emphasis added). But while the law applicable to prisoners' religious rights is well developed, Plaintiffs cite no authority addressing a prison regulation that affects the religious liberty of non-

31

prisoners who wish to attend religious services with prisoners, relying for the most part on the law applicable to prisoners.

That law must take account of both the rights of prisoners to religious liberty and the security needs inherent in prison administration. Precisely because prisoners' lives are (and for the most part must be) closely controlled in ways that non-inmates' lives are not, courts must take care to ensure that prisoners' ability to exercise their religions is not unnecessarily impeded. "Although we recognize that great deference should be accorded to prison officials as they undertake the difficult responsibility of maintaining order in prisons, we have long held that prisoners should be afforded every reasonable opportunity to attend religious services, whenever possible." *Young v. Coughlin*, 866 F.2d 567, 570 (2d Cir. 1989). "A prisoner's first amendment right to the free exercise of his religious beliefs may only be infringed to the extent that such infringement is reasonably related to legitimate penological interests." *Id.* (internal quotation marks omitted), citing *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987). We afford deference to prison administrators and judge prison regulations alleged to infringe constitutional rights under a "reasonableness test less restrictive than that ordinarily applied" to claims of violations of

32

constitutional rights outside the prison setting. *O'Lone*, 482 U.S. at 349 (internal quotation marks omitted).

Courts have had fewer occasions to address prison regulations alleged to infringe the religious liberty of non-prisoners. In principle, it could be argued that different considerations apply in such cases. Unlike sentenced prisoners, the Non-Incarcerated Plaintiffs are free citizens who have committed no crime justifying restrictions on their liberty. At the same time, however, prison officials exercise no direct control over the religious observance of persons residing outside prison, as they do over prisoners. In this case, for example, Quakers not confined at Green Haven are free to schedule the number, location, and timing of their meetings, both for worship and for the conduct of business, at their own discretion and as suits their interest and convenience. Still, as the Supreme Court has noted in cases involving marriage and mail censorship, regulations limiting association of prisoners with outsiders do not affect inmates alone, but can "work[] a consequential restriction on the [constitutional] rights of those who are not prisoners." *Procunier v. Martinez*, 416 U.S. 396, 409 (1974), *overruled on other grounds by Thornburgh*, 490 U.S. 401.

Here, the Non-Incarcerated Plaintiffs claim a right to associate with incarcerated persons for purposes of collective worship and religious discussion. Like non-incarcerated persons who claim a First Amendment right to associate with prisoners for other protected purposes, such as family relationships and political or artistic expression, they seek to enter the domain of the prison itself, where security concerns are pressing. After earlier suggesting that prison rules affecting the rights of non-prisoners may be subject to more searching scrutiny than regulations affecting only prisoners, *see Procunier*, 416 U.S. at 409-12, the Supreme Court ultimately concluded that even where prison regulations affect the First Amendment rights of non-prisoners, the "proper inquiry" remains the standard, derived from *Turner v. Safley*, 482 U.S. 78 (1987), that asks "whether the regulations are 'reasonably related to legitimate penological interests,'" *Thornburgh*, 490 U.S. at 404, quoting *Turner*, 482 U.S. at 89. We think that the same considerations apply to Free Exercise claims, such that the Non-Incarcerated Prisoners cannot claim a right to more searching review of prison regulations affecting religious liberty than the reasonableness standard applied to their incarcerated co-religionists.

"Courts must evaluate four factors in making the reasonableness determination: whether the challenged regulation or official action has a valid, rational connection to a legitimate governmental objective; whether prisoners have alternative means of exercising the burdened right; the impact on guards, inmates, and prison resources of accommodating the right; and the existence of alternative means of facilitating exercise of the right that have only a de minimis adverse effect on valid penological interests." *Salahuddin v. Goord*, 467 F.3d 263, 274 (2d Cir. 2006) (footnote omitted). "The prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." *Id.* at 274–75. "The defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct; the burden remains with the prisoner to show that these articulated concerns were irrational." *Id.* at 275 (internal quotation marks, alteration, and citation omitted).

Plaintiffs argue that moving Quarterly Meetings from Saturdays to weekdays "means that some Friends cannot attend because of work commitments, parental obligations, transportation limitations and age." *Id.* at 40. In support of their position, Plaintiffs point out that "[s]pending extended time

together is a basic element of Quaker religious practice because that is how Jesus taught his disciples to be a loving community." Appellants' Br. at 30. Plaintiffs accordingly contend that DOCCS should modify the Religious Holy Day Calendar to restore Quarterly Meetings scheduled on Saturdays.

Defendants respond that Plaintiffs have failed to clearly establish that Defendants' actions concerning Quarterly Meetings substantially burden Plaintiffs' exercise of religion since Defendants *rescheduled* the meetings for Friday evenings and did not terminate them. Defendants argue that Plaintiffs' desire to hold Quarterly Meetings on Saturdays is driven by convenience rather than religious significance and is therefore insufficient to show a substantial burden. Moreover, Defendants point out that they sought to accommodate Green Haven Meeting's concerns about meeting length by offering to hold at least one of the four Quarterly Meetings as a special event.

We conclude that Defendants have the better argument. In finding that Plaintiffs "ha[d] not established a clear likelihood of success in proving that the restrictions create a substantial burden on their free exercise rights," the district court noted that Plaintiffs themselves "describe[d] the moving of the meetings as an inconvenience." Sp. App'x at 18. The district court properly cautioned that it

36

was "not making light of the inconvenience." *Id.* at 19. Plaintiffs noted that the scheduling change, *inter alia*, "restricted the number of participants" at Quarterly Meetings, "converted a full day (6 hours) religious gathering to 2 hours," and "eliminated food from the event." Appellants' Br. at 41-42. While these are genuine burdens, particularly in light of the 35-year history of Saturday Quarterly Meetings in Green Haven without adverse incident, we conclude that these burdens do not rise to the level of "substantial" burdens on Plaintiffs' religious exercise, at least in the constitutional sense. Like the district court, we find it significant that nowhere in the record do Plaintiffs claim that Saturdays have religious significance in the Quaker community. The point is not that only restrictions on practices mandated by a prisoner's religion can be a substantial burden. To the contrary, we have noted that "[n]either the Supreme Court nor we . . . have ever held that a burdened practice must be mandated in order to sustain a prisoner's free exercise claim." *Ford v. McGinnis*, 352 F.3d 582, 593 (2d Cir. 2003). Rather , the point here is that Plaintiffs have failed to establish that scheduling the Quarterly Meetings on Saturdays (as opposed to any other day) bears any religious significance whatsoever; the inconveniences they suffer as a

result of Defendants' decision, therefore, cannot constitute substantial burdens on their *religious* exercise.

The scheduling shift proposed by the Green Haven administration did not forbid Quarterly Meetings between incarcerated and non-incarcerated Quakers for communal religious services.[7] Unquestionably, holding the services on weekday evenings rather than Saturdays would inconvenience some of the Non-Incarcerated Plaintiffs, even to the point that it might be impossible for some of them to attend. But the particular Non-Incarcerated Plaintiffs have no constitutional right to have services at Green Haven scheduled to suit their convenience. Nor does any inconvenience to particular individuals defeat the ability of inmates and non-inmates to conduct joint services, as other non-incarcerated Quakers might find a weekday event easier to attend. Thus, the various rescheduling proposals provided alternative means for Quaker prisoners and their non-incarcerated brethren to fulfill the religious goal of communal

---

[7] Although Plaintiffs argue that the issue here is the cancellation of the Quarterly Meetings, the record does not support their claim that the issue should be so conceived. It is true that after the Incarcerated Plaintiffs rejected the rescheduled meetings proffered by the administration, the result was that no Quarterly Meetings at all were scheduled. But that outcome appears to have resulted as much from Plaintiffs' intransigence as from any decision of Defendants. There is no indication that Defendants ever rescinded their various proposals for rescheduled Quarterly Meetings, and Defendants even offered to hold one of those meetings as a "special event" with extended hours.

discussion and worship services, in ways that imposed lessened security risks and a lesser burden on prison staff than the risks and burden posed by Plaintiffs' preferred schedule.

Moreover, the record reinforces the district court's conclusion that Defendants' rescheduling decision was supported by legitimate concerns – specifically, that there were irregularities in attendance at Quarterly Meetings, excessive call-outs, and overcrowding in the meeting space. Thus, even if we find that the scheduling changes do create a substantial burden, we conclude that Defendants have met their "burden of identifying the legitimate penological interests that justify the impinging conduct." *Salahuddin*, 467 F.3d at 275. Here, the Quarterly Meetings create additional security concerns and disrupt equitable allocation of scarce staffing and resources, since special events involving outside visitors require extra security to protect civilian visitors and to maintain safety in the facility – a burden that is heightened on weekends, when fewer staff members are on duty. Defendants thus have a legitimate penological interest in limiting Saturday gatherings. It is possible that other accommodations or solutions could be imagined that would serve that interest while preserving at least some Saturday meetings involving non-incarcerated Friends. But as the

39

Supreme Court reminds us, "the realities of running a penal institution are complex and difficult," such that "wide-ranging deference [must] be accorded [to] the decisions of prison administrators." *Jones v. N. C. Prisoners' Lab. Union, Inc.*, 433 U.S. 119, 126 (1977). Whatever the result may be once the record is fully developed in this case, at this stage of the proceedings, we cannot say that Plaintiffs have established a likelihood of success on the merits.

## V.     Balance of Equities and the Public Interest

The final consideration in the preliminary injunction analysis concerns whether the balance of equities tips in favor of granting the injunction and whether that injunction is in the public interest. Defendants suggest that they have an important interest in maintaining "institutional order and security" and proper "allocation of prison resources."  *O'Lone*, 482 U.S. at 350, 352. While there is no doubt that Plaintiffs have a strong interest in their religious freedoms, in the prison setting, we think that on balance, the equities tip on favor of Defendants, particularly where, as here, Defendants have offered to hold Quarterly Meetings on any weekday that Plaintiffs choose and continue to support and allocate resources to the Quaker inmates.

Thus, Plaintiffs have not met their burden of showing that a preliminary injunction is warranted in this case.

## CONCLUSION

For the reasons stated above, we agree with the district court that a preliminary injunction is not warranted. The order of the district court is therefore **AFFIRMED**.